**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| OSAMA AHMED FAHMY,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>JAY-Z, AKA Shawn Carter;<br>TIMOTHY MOSELY, FKA Timbaland;<br>KYAMBO JOSHUA; ROB BOURDON;<br>BRAD DELSON; MIKE SHINODA;<br>DAVE FARRELL; JOSEPH HAHN;<br>CHESTER BENNINGTON; BIG BAD MR<br>HAHN MUSIC; CHESTERCHAZ<br>PUBLISHING; EMI BLACKWOOD<br>MUSIC, INC.; EMI MUSIC<br>PUBLISHING LTD.; KENJI KOBAYASHI<br>MUSIC; LIL LULU PUBLISHING;<br>MACHINE SHOP RECORDINGS, LLC;<br>MARCY PROJECTS PRODUCTIONS II,<br>INC.; MTV NETWORKS ENTERPRISE,<br>INC.; NONDISCLOSURE AGREEMENT<br>MUSIC; PARAMOUNT HOME<br>ENTERTAINMENT, INC.; PARAMOUNT<br>PICTURES CORPORATION; RADICAL<br>MEDIA; ROB BOURDON MUSIC; ROC-<br>A-FELLA RECORDS, LLC;<br>TIMBALAND PRODUCTIONS, INC.;<br>UMG RECORDINGS, INC.; UNIVERSAL<br>MUSIC AND VIDEO DISTRIBUTION,<br>INC.; WARNER MUSIC, INC.,<br>*Defendants-Appellees*. | No. 16-55213<br><br>D.C.<br>No. 2:07-cv-<br>05715-CAS-<br>PJW<br><br><br>AMENDED<br>OPINION |

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted December 8, 2017
Pasadena, California

Filed May 31, 2018
Amended November 1, 2018

Before:  Carlos T. Bea, Consuelo M. Callahan,
and Paul R. Kelly,* Circuit Judges.

Opinion by Judge Bea

---

* The Honorable Paul J. Kelly, Jr., United States Circuit Judge for
the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

# SUMMARY**

## Copyright

The panel affirmed the district court's grant of judgment as a matter of law in favor of rapper Jay-Z and other defendants on copyright infringement claims brought by the heir to Egyptian composer Baligh Hamdy's copyright in a 1957 arrangement of the song *Khosara*.

Jay-Z used a sample from the arrangement in the background music to his hit single *Big Pimpin'*.

The district court held that the heir, Osama Ahmed Fahmy, lacked standing to bring the copyright claims. First, the district court held that Egyptian law recognizes a transferable right of "adaptation," such that when Fahmy transferred "all" of his economic rights to Mohsen Mohammed Jaber in a 2002 agreement, the transfer included the right to create derivative works adapted from *Khosara*. The district court concluded that the right of adaptation is an economic right under Egyptian law, not an inalienable moral right. Second, the district court held that the conveyance of rights contained in the 2002 agreement complied with the requirements of Article 149, the Egyptian law governing the transfer of economic rights. Accordingly, the 2002 agreement successfully conveyed a right of adaptation of *Khosara* to Jaber. Third, a reservation of rights found at the end of the 2002 agreement referred to the right to receive

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

royalties, and thus did not confer standing on Fahmy to bring a claim of copyright infringement.

Affirming, the panel concluded (1) that Egyptian law recognizes a transferable economic right to prepare derivative works; (2) that the moral rights Fahmy retained by operation of Egyptian law were not enforceable in U.S. federal court; and (3) that, even if they were, Fahmy had not complied with the compensation requirement of Egyptian law, which did not provide for his requested money damages, and which provided for only injunctive relief from an Egyptian court. The panel held that the district court properly interpreted the 2002 agreement as conveying to Jaber the economic right to create derivative works. In addition, the fact that Fahmy retained the right to royalties did not give him standing to sue for copyright infringement.

---

## COUNSEL

Keith J. Wesley (argued), Corbin K. Barthold, and Peter W. Ross, Browne George Ross LLP, Los Angeles, California, for Plaintiff-Appellant.

Christine Lepera (argued), Mitchell Silberberg & Knupp LLP, New York, New York; David A. Steinberg, Mitchell Silberberg & Knupp LLP, Los Angeles, California; Andrew H. Bart, Jenner & Block LLP, New York, New York; for Defendants-Appellees.

**OPINION**

BEA, Circuit Judge:

Days before the turn of the new millennium, rapper Jay-Z released an album containing his soon-to-be hit single *Big Pimpin'*. The background music to that track used a sample from a 1957 arrangement by Egyptian composer Baligh Hamdy. Today, we are faced with the question whether the heir to Hamdy's copyright (Appellant Fahmy) may sue Jay-Z for infringement based solely on the fact that Egyptian law recognizes an inalienable "moral right" of the author to object to offensive uses of a copyrighted work. We hold that he cannot.

I

A

In 1957, Baligh Hamdy composed the music to the song *Khosara* for the Egyptian movie *Fata Ahlami*. The song quickly became popular in Egypt. In 1968, Hamdy agreed to transfer certain license and distribution rights to an Egyptian recording company, Sout el Phan.[1] When Hamdy died in 1993, his heirs inherited whatever rights he retained in *Khosara*. Appellant Osama Ahmed Fahmy ("Fahmy") is one of these heirs.

In August 1995, Hamdy's heirs, including Fahmy, who acted as the heirs' representative, executed another agreement with Sout el Phan, confirming the continuing

---

[1] The agreement was written in Arabic. A certified translation can be found in the record.

viability of the rights transferred through the 1968 agreement.[2]  In December 1995, Sout el Phan transferred certain of its exclusive rights to a company called EMI Music Arabia ("EMI"). This agreement transferred to EMI, among other things, "the sole and exclusive right to protect, publish and/or sub-publish songs" contained on records in the Sout el Phan catalog, including *Khosara*.  After the December 1995 agreement, EMI possessed the rights, previously held by Sout el Phan, to license and distribute recordings of *Khosara* in every country but Egypt.  Sout el Phan retained the rights to license and distribute in Egypt.

Appellees enter the picture a few years later.  In 1999, rapper Shawn Carter (professionally known as, "Jay-Z") and music producer Timothy Mosley (professionally known as, "Timbaland") produced a hit song, *Big Pimpin'*, that used portions of *Khosara* as a background track to Jay-Z's rap lyrics.[3]  They thought the music was part of the public domain and did not obtain permission to use it.  EMI disagreed.  As a result, in late 2000, EMI asserted its rights to the music, and Mosley paid EMI $100,000 for the right to exploit *Khosara* in *Big Pimpin'*.

Fahmy became aware of *Big Pimpin'* in December 2000. As a result, he authorized a U.S.-based intellectual property attorney, David Braun, to investigate a copyright infringement claim against Jay-Z.  According to Fahmy, an

---

[2] Also originally in Arabic, a certified translation of the 1995 agreement is in the record.  The parties agree that the 1995 agreement reaffirmed rights transferred in the 1968 agreement.

[3] The Defendants-Appellees in this lawsuit include a long list of music producers and record labels, all of whom were involved in the production and/or distribution of various iterations of *Big Pimpin'*.  For convenience, we refer to the Appellees collectively as "Jay-Z."

attorney at EMI told Braun that EMI had a valid license to exploit *Khosara* but refused to disclose the agreement to Braun. Braun eventually declined to represent the Hamdy heirs.

Around 2001, control of Sout el Phan's musical catalog passed to another Egyptian entity called Alam el Phan. In 2002, independent of the agreements previously mentioned, Fahmy, as representative of the Hamdy heirs, including himself, signed an agreement with the owner of Alam el Phan, Mohsen Mohammed Jaber. The agreement transferred to Jaber certain rights to *Khosara*. Exactly which rights were transferred in this 2002 Agreement[4] is the central dispute in this lawsuit. The agreement, in relevant part, reads as follows:

> I, Osama Ahmed Fahm[y] . . . in person and in my capacity as the representative of the heirs of the late [Baligh Hamdy] hereby assign to Mr. Mohsen Mohammad Jaber . . . and to whoever he selects, the right to print, publish and use the music of the songs stated in this statement [including *Khosara*] **on all currently known audio** and/or visual of videos, performances, records, cassette tapes, and cartridges in addition to all the modern technological and digital means such as the internet, telephones, satellites, or any other means that may be invented in the future ***including musical re-segmentation and alteration methods*** while maintaining the original segment of the music. ***This***

---

[4] Like the other agreements, the 2002 Agreement was written in Arabic. A certified translation can be found in the record.

*authorization grants Mr. Mohsen Mohammad Jaber solely/or to whoever he selects, the right to publish and sell these songs using all the means available in all parts of the world.* I do hereby approve, by signing this authorization to pledge not to dispose once again of this music, or republish, sell, or present them to any other individual, company, authority, or institution.

I do hereby further state that *by signing this authorization and waiver of these pieces of music to Mr. Mohsen Mohammad Jaber, I would have authorized him solely and/or whoever he selects, fully, and irrevocably the right to use this music in whatever way he deems necessary. Mr. Mohsen Mohammad Jaber or his successors are solely the owners of the financial usage rights stated in [Article 147 of the 2002 Egyptian Copyright Law[5]] for the pieces of music listed hereinafter in the Arab Republic of Egypt and the whole world [including Khosara],* and the use includes all the usage means and methods whether those currently available or those that will be invented in the future and whether it was audio, visual or audiovisual including the new digital and technology means during the

---

**[5]** The 2002 Agreement uses the phrase "Law No. 82 for the year 2002." But that phrase is a reference to Article 147 of the 2002 Egyptian Copyright Law.

whole legal protection period specified by the law.

. . .

Mr. Mohsen Mohammad Jaber and his successor become the sole publisher of the melodies of these songs in all the current publishing means and in any way he deems whether it was direct or indirect. Mr. Mohsen Mohammad Jaber also has the right to transfer all these rights or some of them or dispose them to another company or institution using any trademark he selects. . . .

***I [Appellant] did also fully assign to Mr. Mohsen Mohammad Jaber all our rights clarified in [the 1968 Agreement]*** between Sout El Phan Company and the musician [Baligh Hamdy], or any other contracts and/or rights pertaining to those pieces of music. As such, signing on this document is considered as a final quittance from any of our dues from Sout El Phan, and Mr. Mohsen Jaber, and his successor, has the right to request and receive any financial dues relevant to this music from any party . . . .

I [Appellant] received the amount of 115,000 (only one hundred fifteen thousand Egyptian Pounds) for this waiver and declaration while

> maintaining our rights in respect of the public
> performance and mechanical printing.

(Emphasis added).

## B

Notwithstanding this 2002 Agreement, Fahmy filed the instant lawsuit against Jay-Z in 2007, claiming to have retained certain rights to the *Khosara* copyright. The complaint contained three causes of action for copyright infringement[6] under Section 106(2) of the Copyright Act[7], and a state law claim for unfair business practices. The claim for unfair business practices was subsequently dismissed and is not at issue in this appeal.

On December 9, 2011, the district court granted Jay-Z's motion for partial summary judgment, holding that based on the Copyright Act's "rolling" statute of limitations Fahmy "may recover damages from any infringement only within three years prior to the filing of his lawsuit—*i.e.*, from August 31, 2004 to the present." That order is not challenged in this appeal.

---

[6] The three causes of action relate to three different infringements, all of which relate to Jay-Z's *Big Pimpin'*. The first was based on the initial publication of *Big Pimpin'*; the second, based on a collaborative remake of *Big Pimpin'*, performed and published with the band Linkin Park; and the third, based on *Fade to Black*, a film which depicts Jay-Z performing *Big Pimpin'*. With respect to our analysis here, the claims are identical.

[7] Section 106(2) of the Copyright Act, 17 U.S.C. § 106(2), gives copyright owners the "exclusive rights to do and to authorize . . . prepar[ation of] derivative works based upon the copyrighted work."

On August 12, 2013, the district court granted Jay-Z's motion for summary judgment based on the doctrine of laches, holding that Fahmy's more than six-year delay in filing his complaint after hearing of the infringement was unreasonable and prejudiced Jay-Z.  However, on May 19, 2014, the Supreme Court held in a different case that laches cannot be invoked to preclude copyright claims filed within the limitations period.  *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1967 (2014).  Thereafter, the district court granted Fahmy's motion for reconsideration and vacated its summary judgment order to the extent it barred certain claims based on laches.

On September 24, 2015, the district court ruled on several pretrial motions.  First, it granted Jay-Z's motion in limine to prohibit Fahmy from playing sound recordings of *Khosara* as evidence of the copyright.  The court held that "[p]resenting the sound recordings at trial carries a significant risk of confusing and misleading the jury," which was "particularly problematic because [Fahmy] admits that his copyright does not include the 1992 recording [of *Khosara*]."[8]  Second, the court granted Fahmy's motion to bifurcate the liability and damages phases of the trial.  Third, the court denied Jay-Z's request to resolve at the outset of trial issues of foreign law, including whether the 2002 agreement between Fahmy and Jaber "effectuated a complete transfer of plaintiff's rights in *Khosara*, therefore denying [Fahmy] standing to bring the suit."  The court held that, because "neither party had presented expert testimony regarding the meaning of the 2002 agreement under

---

[8] Fahmy filed a motion to reconsider this ruling at trial, which was denied.

Egyptian law," there remained "genuine issues of fact as to whether plaintiff conveyed all of his rights."

Trial commenced on October 13, 2015.  The first phase of the bifurcated trial (liability) concluded on October 20, 2015.  That same day, Jay-Z filed a motion under Federal Rules of Civil Procedure 50 and 52 for judgment as a matter of law, asking the court to grant judgment in his favor on the ground that Fahmy lacked standing to bring the copyright claims.  Fahmy also filed a Rule 50 motion for judgment as a matter of law, arguing that he had established Jay-Z's liability under the Copyright Act.

On October 21, 2015, the court entered an order granting Jay-Z's motion for judgment as a matter of law.  Because the standing issue decided the case, the court declined to reach Fahmy's motion for judgment as a matter of law.

The district court decision proceeds in three parts, each of which is separately challenged by Fahmy.  First, the court held that Egyptian law recognizes a transferable right of "adaptation," such that when Fahmy transferred "all" of his economic rights to Jaber in the 2002 Agreement, that included the right to create derivative works adapted from *Khosara*.  This first ruling included the holding that the right of adaptation is an *economic* right under Egyptian law, not an inalienable *moral* right.[9]  Second, the district court held that the conveyance of rights contained in the 2002 Agreement complies with the requirements of Article 149, the Egyptian law governing the transfer of economic rights.  Accordingly, the 2002 Agreement successfully conveyed a

---

[9] The parties agree that the district court's application of Egyptian law here was proper because the 2002 Agreement was formed and executed in Egypt.

right of adaptation of *Khosara* to Jaber.  Third, the district court held that the reservation of rights found at the end of the 2002 Agreement—*i.e.*, the reservation of the "rights in respect of the public performance and mechanical printing"—refers to the right to receive royalties, and thus does not confer standing on Fahmy to bring a claim of copyright infringement.

As a result of the foregoing determinations, the district court granted Jay-Z's motion for judgment as a matter law. Fahmy appealed.

## II

We review de novo the district court's grant of judgment as a matter of law.  *Electro Source, Inc. v. United Parcel Serv., Inc.*, 95 F.3d 837, 838 (9th Cir. 1996). Whether a party has standing under the Copyright Act to sue for infringement and whether the district court correctly interpreted and applied foreign law are also reviewed de novo.  *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1002 (9th Cir. 2015) (Copyright Act); *Brady v. Brown*, 51 F.3d 810, 816 (9th Cir. 1995) (foreign law).

## III

## A

To have standing to sue for the copyright infringement alleged to have been done by Jay-Z's adaptation of *Khosara*, Fahmy must have retained the exclusive right to prepare derivative works of *Khosara*, such as *Big Pimpin'*.[10]  Fahmy

---

[10] *See* 17 U.S.C. § 106 (listing the right "to prepare derivative works" among the bundle of "exclusive rights" vested in the owner of the copyright); *see also* § 201(d) (making each exclusive right

advances three alternative arguments for why he has retained that right. First, he argues that, under Egyptian law, it is impossible to transfer the right to prohibit derivative works because it is a right subsumed within Egyptian "moral rights," and is thus inalienable. Whether the terms of the 2002 Agreement purport to convey it or not, Fahmy insists that he retains the right to prohibit derivative works. Second, he argues that, even if transfer of the right were possible under Egyptian law, the 2002 Agreement does not clearly and unequivocally convey that right to Jaber, as required by Egyptian law for any such conveyance to be valid. Thus, Fahmy asks us to hold, as a matter of contract interpretation, that the 2002 Agreement did not convey to Jaber the right to prohibit others to make derivative works. Third, Fahmy contends that he has standing to sue for copyright infringement by virtue of his right to receive royalties, which is reserved in the 2002 Agreement. None of his arguments are availing.

1

Copyright holders in Egypt possess both moral and economic rights. As both parties concede, Egypt recognizes a moral right of "integrity," which is wholly separate from a copyright holder's economic rights, and which confers upon the author of the copyrighted material the right to object to those derivative works the author deems to be "distortions" or "mutilations" of the work, whether or not the relevant economic rights have been transferred. As the district court

---

transferrable "in whole or in part" and entitling the "owner of any particular exclusive right . . . to all of the protection and remedies accorded to the copyright owner by this title"). A logical extension of the *exclusive* right to "prepare" derivative works is the right to prohibit others from doing so without permission.

explained, moral rights are intended to protect the "presumed intimate bond between authors and their works" and are based on the notion that an author's work is "almost universally understood to be an extension of the author's personhood." In sum, moral rights protect the author's personal or moral interests in the work and, for this reason, are not transferable to another party.

By contrast, economic rights protect the author's right *to profit* from his work. Article 147 of the 2002 Egyptian Copyright Law[11] ("Article 147") provides that the author of a copyrighted work and his successor have "the exclusive right to authorize or prevent any form of exploitation of his work, particularly through reproduction, broadcasting, rebroadcasting, public performance, public communication, translation, adaptation, rental, lending or making the work available to the public in any manner." Furthermore, Article 149 of the same Egyptian statute ("Article 149") allows the owner of a copyright to transfer "all or some of his economic rights."

Fahmy contends that the exclusive right to prepare (and prohibit) derivative works is an inalienable moral right, not a transferable economic right. The record supports the proposition that an author's moral rights in Egypt include some sort of limited right to object to supposed "distortions" or "mutilations" of the author's work. But the record plainly does not support Fahmy's argument that the specific right to prepare derivative works *for profit* is a non-transferable, non-economic right. Fahmy's own expert testified that an "adaptation," as used in Article 147, is the same thing as a

---

[11] The parties agree that the 2002 version of the Egyptian Copyright Law governs here because it was the operative statute at the time of the 2002 Agreement.

"derivative work." Therefore, the plain language of Article 147, which grants authors the right to authorize "adaptations" of their copyrighted works, and Article 149, which gives authors the right to transfer "all or some" of their economic rights, combine for the straightforward conclusion that the right to prepare derivative works from the copyrighted work for profit can be transferred under Egyptian law.

This conclusion would not necessitate the determination that Fahmy lacks standing to sue if the moral right to prevent "distortions" and "mutilations" were enforceable in the United States. However, Fahmy's moral rights are not enforceable here for at least two reasons. First, federal law does not recognize the moral rights at issue here. The Copyright Act recognizes some moral rights, but only for certain "work[s] of visual art." *See* 17 U.S.C. § 106A(a) (granting to "the author of a work of visual art" an inalienable right to prevent "distortion, mutilation, or other modification" which might prejudice the author's "honor or reputation"); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (recognizing that, "[e]xcept for a limited universe of works of visual art, . . . United States copyright law generally does not recognize moral rights"). No provision of the Act recognizes a moral right to prevent distortions or mutilations of copyrighted music.

Moreover, while the Berne Convention[12] offers some protection to foreign copyright holders in the United States, it does not help Fahmy. The Convention guarantees only

---

[12] The Berne Convention for the Protection of Literary and Artistic Works ("the Convention") is "the principal accord governing international copyright relations." *Golan v. Holder*, 565 U.S. 302, 306–07 (2012). The United States joined in 1989. *Id.* at 307.

that holders of foreign copyrights are afforded "the same protection" as holders of domestic copyrights, a policy known as the "principle of national treatment." *Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd.*, 61 F.3d 696, 700 (9th Cir. 1995); *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1097 (9th Cir. 1994) (en banc) (quoting 3 David Nimmer & Melville B. Nimmer, Nimmer on Copyright § 17.05 at 17–39 (1994) ("The applicable law is the copyright law of the state in which the infringement occurred, not that of the state of which the author is a national or in which the work was first published."). In other words, parties to the Convention, such as the U.S., are not required to grant foreign copyright holders rights which are not granted to its domestic copyright holders. Since our federal law does not accord protection of moral rights to American copyright holders as to non-visual art, neither does it recognize Fahmy's claim to moral rights. That Fahmy retains moral rights in Egypt does him no good here.

Second, even if federal law recognized the moral rights of musical authors (or merely enforced foreign copyright law), the specific right Fahmy retains under Egyptian law entitles him only to injunctive relief in Egypt. The 2002 Egyptian Copyright Law—after granting to authors the "perpetual[,] imprescriptible[,] and inalienable moral right[ ]" to prevent a "distortion or mutilation of the work" in Article 143—specifies the author's recourse for violations of such rights in Article 144:

> Where serious reasons arise, the author alone shall have the right to request the court of first instance to prevent putting the work in circulation, withdraw the work from circulation or allow making substantive modification to the work, notwithstanding his

> disposal of the economic exploitation rights. In such a case, the author shall, within a delay fixed by the court, pay in advance a fair compensation to the person authorised to exercise the economic rights of exploitation, failing which the court decision shall have no effect.

Not only does the plain language of Article 144 grant exclusively injunctive relief, it also requires the author to pay "fair compensation to the person authorised to exercise the economic rights of exploitation." Absent the payment of fair compensation, the court's injunction has "no effect." Thus, even in Egypt, Fahmy's moral rights would be insufficient to win him anything but an injunction. And before he could obtain that, Fahmy would have to compensate Jay-Z fairly for limiting what would otherwise be an unencumbered economic right to exploit *Khosara*, a right for which Jay-Z already paid $100,000. The record is silent as to whether Fahmy has made any offer of such compensation. Indeed, such a proffered compensation is a far cry from the result Fahmy seeks here. Fahmy asks the court not simply to enjoin further use of *Khosara* but also to award him damages and a portion of Jay-Z's "profits and gains." We cannot do so. Assuming *arguendo* that Fahmy's moral rights are enforceable in federal court, we could not grant the relief he seeks because he is not entitled to it—not even in Egypt.

Expert testimony confirms this reading of Article 144. Jay-Z's expert, Egyptian lawyer Abou Farhat, testified that "[m]oral rights . . . are applicable only in Egypt." When asked what recourse an author has when his moral rights are violated, Farhat said an author may "go [into] Egypt before an Egyptian court and ask it to enforce" his right to enjoin distortions and mutilations. Farhat's testimony thus

supports the above reading of Article 144 (*i.e.*, that moral rights holders may seek only injunctive relief in Egypt) and comports with this court's prior cases, which outline the "principle of national treatment" (*i.e.*, that federal law treats foreign copyrights the same as U.S. copyrights). Farhat's testimony also was not contradicted by the testimony of Fahmy's expert, Dr. Hossam Mohammad Loutfi. Accordingly, like the district court, we credit Farhat's testimony and find that the remedy set forth in Article 144 is for only injunctive relief in Egypt, and then only upon proffer of the compensation required in Egypt.[13]

We thus conclude (1) that Egyptian law recognizes a transferable economic right to prepare derivative works; (2) that the moral rights Fahmy retained by operation of Egyptian law are not enforceable in U.S. federal court; and (3) that, even if they were, Fahmy has not complied with the compensation requirement of Egyptian law, which does not

---

[13] We emphasize that it is our prerogative under Federal Rule of Civil Procedure 44.1 to "consider any relevant material or source, including testimony," as we do here, in determining a question of foreign law. *See Universe Sales Co., Ltd. v. Silver Castle, Ltd.*, 182 F.3d 1036, 1039 (9th Cir. 1999) ("[I]t is neither novel nor remarkable for a court to accept the uncontradicted testimony of an expert to establish the relevant foreign law."). Moreover, because a determination of foreign law "must be treated as a ruling on a question of law," Fed. R. Civ. P. 44.1, our review of the district court's determination is de novo. *See de Fontbrune v. Wofsy*, 838 F.3d 992, 996–1000 (9th Cir. 2016) (explaining that the "adoption of Rule 44.1 in 1966 marked a sea change in the treatment of foreign law . . . by making the process of ascertaining foreign law equivalent to the process for determining domestic law"); *City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009) (citing Rule 44.1 for the proposition that foreign law determinations are reviewed de novo).

provide for his requested money damages, and which provides for only injunctive relief from an Egyptian court.

2

The 2002 Agreement unambiguously conveys to Jaber the economic right to create derivative works. Egyptian law requires a conveyance of economic rights to (1) be "certified in writing,"[14] and (2) "contain an explicit and detailed indication of each right to be transferred with the extent and purpose of the transfer and the duration and place of exploitation." The 2002 Agreement is a writing which "assign[s]" to Jaber the right to "print, publish and use the music of [*Khosara*]," including with "musical re-segmentation and alteration methods . . . in all parts of the world." It also makes Jaber and his successors "solely the owners of the financial usage rights stated in [Article 147 the 2002 Egyptian Copyright Law]." These "financial usage rights" are the economic rights listed in Article 147, which include the right of "adaptation," *i.e.*, the right to prepare derivative works. Thus, the plain language of the 2002 Agreement purports to convey the very right that Fahmy needs to have so as to have a cognizable injury, and thus to have standing to sue for copyright infringement. Furthermore, the agreement also specifies the duration of the agreement ("the whole legal protection period specified by the law") and the place of exploitation ("in all parts of the world"), as required by Article 149.

Fahmy argues that the 2002 Agreement is deficient for failing to "contain an explicit and detailed indication of each right to be transferred," per Article 149. Specifically, he

---

**14** Fahmy does not argue that the 2002 Agreement is invalid because it is not "certified."

argues that the conveyance would fail, despite the parties' intentions, because the agreement does not state "separately, clearly, and unequivocally" that it transfers the "right to make changes to future versions of *Khosara*."

We find the district court's refutation of this argument persuasive. The court held that "it would be unreasonable to interpret Egyptian law to require a copyright holder who is purporting to transfer 'all' of the economic rights in his copyright to *also* separately identify each economic right to be transferred."[15] Indeed, identifying each right to be transferred would not only be redundant, it also runs the risk of being counterproductive—in the future, the list could be "used to infer an intent *not* to transfer rights other than those specifically delineated." Additionally, Article 147, by its own terms, does not purport to provide an exhaustive list of economic rights ("The author and his universal successor shall have the exclusive right to authorise or prevent any form of exploitation of his work, *particularly through* reproduction, broadcasting, [etc.] . . . .") (emphasis added)[16], and the related Article 149 expressly allows for the transfer of "*all* or some . . . economic rights" (emphasis added). Neither of these provisions makes sense if a transfer of "all" economic rights is impossible without an exhaustive list. Finally, the record contains expert testimony indicating that

---

[15] *See generally* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 101–02 (2012) (explaining that phrases which include "general terms," such as the phrase "all persons" in the Fourteenth Amendment, should "be accorded their full and fair scope," unless there is "some indication to the contrary").

[16] *See* READING LAW 132–33 (2012) (noting that the introduction of a list with the word "including" is presumed to be nonexhaustive). Here, we apply the same presumption to the words "particularly through."

the only way to "assign[ ] all the rights" is to "refer to the Article 147 itself." This is exactly what the 2002 Agreement does. Thus, we hold that the district court properly interpreted the 2002 Agreement: it conveys to Jaber the economic right to create derivative works.

3

Fahmy's final argument is that the 2002 Agreement reserves his right to receive royalties,[17] thus making him a "beneficial owner" of the *Khosara* copyright and conferring upon him standing to sue for copyright infringement.[18] This argument also fails.

A copyright consists of a bundle of six statutorily created rights, codified at 17 U.S.C. § 106. The statute confers upon the owner of the copyright the following exclusive rights:

> **(1)** to reproduce the copyrighted work in copies or phonorecords;
>
> **(2)** to prepare derivative works based upon the copyrighted work;

---

[17] A "royalty" is "[a] payment—in addition to or in place of an up-front payment—made to an author or inventor for each copy of a work or article sold under a copyright or patent." BLACK'S LAW DICTIONARY 1528 (10th ed. 2014). "Royalties are often paid per item made, used, or sold, or per time elapsed." *Id.*

[18] Jay-Z argues the court should ignore this argument as waived because it was not raised below. However, in Fahmy's reply brief, he points to a spot in the record in which the argument was raised. We therefore consider it.

**(3)** to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

**(4)** . . . to perform the copyrighted work publicly;

**(5)** . . . to display the copyrighted work publicly; and

**(6)** . . . to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106. Under the Copyright Act, "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled to institute an action *for any infringement of that particular right* . . . ." 17 U.S.C. § 501 (emphasis added). While the Copyright Act does not define "beneficial ownership," this court has explained that "[t]he classic example of a beneficial owner is 'an author who ha[s] parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees.'" *DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978, 988 (9th Cir. 2017) (quoting *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1144 (9th Cir. 2003)).

Fahmy's copyright claims against Jay-Z specifically allege infringement of only the right to prepare derivative works under § 106(2).[19] Fahmy thus must show that he is

---

[19] Fahmy's summary judgment briefing made it abundantly clear that he claims infringement only of derivative rights: "There is no claim in this case that Defendants infringed Plaintiff's copyright only by

the legal or beneficial owner of "that particular right" in Khosara's copyright bundle. *See* 17 U.S.C. § 501(b).  He has not done so.  Fahmy points to the 2002 Agreement in support of the idea that he retained royalty rights, but the 2002 Agreement states only that Fahmy retained royalty rights with respect to "the public performance and mechanical printing" of *Khosara*.  Fahmy's right to receive royalties from the "public performance" of *Khosara* clearly refers to the rights under § 106(4) and § 106(6).  And Fahmy's right to receive royalties from the "mechanical printing" of *Khosara* refers to a term of art in copyright law called "mechanical reproduction," whereby royalties are paid every time a composition is reproduced, referring to the right under § 106(1).[20]

There is no evidence that Fahmy retained the right to collect royalties with respect to the creation of derivative works based on *Khosara*.  Because Fahmy is not the beneficial owner of the right that Fahmy alleges Jay-Z

---

'reproducing' – i.e., making identical 'copies' or 'phonorecords' – of any material object in which Khosara was first fixed in tangible form. Instead this case concerns the unauthorized preparation of derivative works."

[20] The term "mechanical reproduction" came about with the advent of player pianos—a disruptive technology that first allowed for the mechanical production of music through the reproduction and sale of player piano rolls. *See* Gary Myers & George Howard, *The Future of Music: Reconfiguring Public Performance Rights*, 17 J. Intell. Prop. L. 207, 215 (2010).  While player pianos are a thing of the past, the "mechanical" term endures to describe reproductions of music on records, CDs, or even digital downloads.  *Id.*; 17 U.S.C. § 115.  Each time that a record is reproduced in such a "mechanical" format, a "mechanical royalty" must be paid to the beneficial owner of the exclusive right to reproduction of the copyrighted work under § 106(1).

infringed—the right codified in § 106(2) related to preparation of derivative works—Fahmy lacks standing to sue for infringement of that right.

For the foregoing reasons, we agree with the district court's conclusion that Fahmy lacked standing to sue Jay-Z for copyright infringement.[21]

## IV

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

[21] Because we hold Fahmy lacks standing to assert a copyright infringement claim, we do not address his remaining arguments on other issues.