FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

NOV 10 2022

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNICOLORS, INC., a California Corporation,

Plaintiff-Appellee,

v.

H&M HENNES & MAURITZ, L.P., a New York limited partnership,

Defendant-Appellant.

No. 18-56253
      18-56548

D.C. No.
2:16-cv-02322-AB-SK

OPINION

On Remand from the United States Supreme Court

Before: Carlos T. Bea and Bridget S. Bade, Circuit Judges, and Jon P. McCalla,[*] District Judge.

Opinion by Judge Bea

---

[*]    The Honorable Jon P. McCalla, United States District Judge for the Western District of Tennessee, sitting by designation.

# SUMMARY[**]

## Copyright

On remand from the Supreme Court in this copyright-infringement action brought by Unicolors, Inc., against H&M Hennes & Mauritz, L.P., the panel affirmed the district court's judgment in general, save that it vacated and remanded with instructions to grant a new trial, limited only to damages, if Unicolors rejects the remittitur amount of $116,975.23.

Unicolors, which creates designs for use on textiles and garments, alleged that a design it created in 2011 (the EH101 design) is remarkably similar to a design printed on garments that H&M began selling in 2015 (the Xue Xu design). The Supreme Court held that lack of either factual or legal knowledge on the part of a copyright holder can excuse an inaccuracy in a copyright registration under the Copyright Act's safe-harbor provision, 17 U.S.C. § 411(b)(1). Accordingly, the panel reviewed anew the threshold issue whether Unicolors holds a valid copyright in registration No. VA-1-770-400 (the '400 Registration), and concluded that under the correct standard, the '400 Registration is valid because the factual inaccuracies in the application are excused by the cited safe-harbor provision.

The panel held that a party seeking to invalidate a copyright registration under § 411(b) must demonstrate that (1) the registrant submitted a resignation application containing inaccuracies, (2) the registrant knew that the application failed to comply with the requisite legal requirements, and (3) the inaccuracies in question were material to the registration decision by the Register of Copyrights. The panel concluded that Unicolors's '400 Registration contained an inaccuracy, but that the district court's finding that Unicolors did not have the requisite knowledge of its application's inaccuracy per § 411(b)(1)(A) is not clearly erroneous. This lack of knowledge means that the '400 Registration falls within the ambit of the safe-harbor provision's protection, notwithstanding its failure to comply with the "single unit" requirement, and that Unicolors's copyright is valid. Unicolors can therefore maintain its infringement action against H&M over the EH101 design, which is covered by that registration.

---

[**]     This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concerning H&M's pretrial challenges, the panel held (1) H&M forfeited any claim of error on appeal based on a claim that Unicolors's President Nader Pazirandeh's statements constituted impermissible, undesignated expert opinion; (2) the district court did not abuse its discretion when it excluded H&M's proffered expert testimony of Robin Lake on the issue of substantial similarity of the EH101 and Xue Xu designs; and (3) the district court did not abuse its discretion in excluding H&M's proffered expert testimony of Justin Lewis on the issue of damages.

The panel then addressed H&M's at-trial challenges.

First, H&M argued that the district court erred in refusing to instruct the jury that the Xue Xu design was presumptively independently created on account of a judicially noticed Chinese copyright in that design. Reviewing the Berne Convention and its protection of foreign copyrights in domestic infringement suits, the panel held that the district court did not err in rejecting H&M's first requested instruction regarding the parties' evidentiary burdens, because that requested instruction was duplicative; and that any error that subsisted in the district court's decision to reject H&M's requested instruction on presumptive validity was harmless.

Second, H&M argued that the district court erred by refusing to admit into evidence Shaoxing County DOMO Apparel Co., Ltd.'s U.S. copyright registration of the Xue Xu design. The panel held that the district court's exclusion of the evidence as prejudicial was not an abuse of discretion, so any error the district court made in determining the certificate's relevance was harmless.

Third, H&M argued that the district court erred by admitting into evidence a previously unproduced, physical exemplar bearing a black-and-white (rather than color) version of EH101. The panel held that H&M forfeited this challenge.

The panel then addressed H&M's post-trial challenges.

H&M challenged the district court's denial of its renewed motion for judgment as a matter of law (RJMOL).

The panel rejected the first basis for H&M's challenge because, as previously discussed, Unicolors has a valid copyright in the '400 Registration. Rejecting H&M's second challenge regarding the RJMOL, the panel held that because there was sufficient evidence to substantiate the jury's finding of striking similarity,

Unicolors also presented sufficient evidence to prove the copying element of its infringement claim. Rejecting the third basis, the panel saw no reason to disturb the jury's willfulness determination.

In its final challenge regarding the RJMOL, H&M argued that the district court erred by impermissibly inflating Unicolors's post-remittitur damages. The district court's remittitur calculation involved profit-disgorgement damages and lost-profit damages. The panel agreed with H&M that the district court's profit-disgorgement remittitur calculation of $247,675.33 was an abuse of discretion, as that amount cannot be sustained using the jury's findings of what Unicolors actually proved at trial. The jury used H&M's *gross profit* per piece, not its *average gross sales price* per piece. Explaining the maximum recovery rule, the panel wrote that the purpose of remittitur is to maintain the jury's verdict while lopping off an excrescence. The panel wrote that a profit-disgorgement figure of $98,441.23 removes the excrescence of profits from extraterritorial sales and the use of average gross sales price rather than the gross profit multiplier, while sustaining the remainder of the jury's verdict. As for lost profits, the district court calculated the maximum amount that Unicolors could have incurred as a result of H&M's infringement to be $18,534, after removing international sales from the jury's calculation. Finding no reversible error with respect to the district court's lost-profit damages calculation, the panel held that H&M forfeited any challenge related to the admissibility of lost-profits evidence. The panel therefore concluded that the proper remittitur amount to take the place of the jury verdict's damages should have been $116,975.23, which is the sum of the proper profit-disgorgement award of $98,441.23 and a lost-profits award of $18,534.00. The panel instructed the district court on remand to grant H&M's request for a new trial if Unicolors rejects this new remittitur amount, but the new trial must be limited only to the issue of damages.

The panel held that the district court did not abuse its discretion in awarding attorneys' fees to Unicolors.

---

## COUNSEL

---

Stephen M. Doniger, Scott Alan Burroughs, and Trevor W. Barrett, Doniger Burroughs APC, Venice, California, for Plaintiff-Appellant.

Staci J. Riordan, Aaron Brian, and Dale A. Hudson, Nixon Peabody LLP, Los Angeles, California, for Defendant-Appellant.

BEA, Circuit Judge:

This case returns to us on remand from the Supreme Court's decision in *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 142 S. Ct. 941 (2022). There, the Court held that lack of either factual *or legal knowledge* on the part of a copyright holder can excuse an inaccuracy in a copyright registration under the Copyright Act's safe-harbor provision. *Id.* at 945; 17 U.S.C. § 411(b)(1). Accordingly, we review anew the threshold issue whether Appellee Unicolors holds a valid copyright in registration No. VA 1-770-400 (the '400 Registration) and conclude that under the correct standard, the '400 Registration is valid because the factual inaccuracies in the application are excused by the cited safe-harbor provision. This determination allows this panel to resolve the outstanding issues in this case. And for the reasons explained below, we agree with Appellee that none of these issues requires disturbing the district court's judgment below. Therefore, we affirm its judgment in general, save that we vacate and remand with instructions to grant H&M's request for a new trial if Unicolors rejects the remittitur amount of $116,975.23, which is an amount lower than the jury verdict and also lower than the amount the district court initially calculated in its judgment. If Unicolors rejects the new remittitur amount, the district court is instructed to grant H&M's request for a new trial, but limited only to the issues of damages.

# I. BACKGROUND

As we previously described:

This is a copyright-infringement action brought by Unicolors, Inc. ("Unicolors"), a company that creates designs for use on textiles and garments, against H&M Hennes & Mauritz L.P. ("H&M"), which owns domestic retail clothing stores. Unicolors alleges that a design it created in 2011 is remarkably similar to a design printed on garments that H&M began selling in 2015. The heart of this case is the factual issue whether H&M's garments bear infringing copies of Unicolors's 2011 design. Presented with that question, a jury reached a verdict in favor of Unicolors, finding the two works at least substantially similar. . . .

Unicolors's business model is to create artwork, copyright it, print the artwork on fabric, and market the designed fabrics to garment manufacturers. Sometimes, though, Unicolors designs "confined" works, which are works created for a specific customer. This customer is granted the right of exclusive use of the confined work for at least a few months, during which time Unicolors does not offer to sell the work to other customers. At trial, Unicolors's President, Nader Pazirandeh, explained that customers "ask for privacy" for confined designs, in respect of which Unicolors holds the confined designs for a "few months" from other customers. Mr. Pazirandeh added that his staff follows instructions not to offer confined designs for sale to customers generally, and Unicolors does not even place confined designs in its showroom until the exclusivity period ends.

In February 2011, Unicolors applied for and received a copyright registration from the U.S. Copyright Office for a two-dimensional artwork called EH101, which is the subject of this suit. Unicolors's registration—No. VA 1-770-400 ("the '400 Registration")—included a January 15, 2011 date of first publication. The '400 Registration is a "single-unit registration" of thirty-one separate designs in a single registration, one of which designs is EH101. The name for twenty-two of the works in the '400 Registration, like EH101, have the prefix "EH"; the other nine works were named with the prefix "CEH." Hannah Lim, a Unicolors textile designer, testified at trial that the "EH" designation stands for "January 2011," meaning these works were

3

created in that month. Ms. Lim added that a "CEH" designation means a work was designed in January 2011 but was a "confined" work.

When asked about the '400 Registration at trial, Mr. Pazirandeh testified that Unicolors submits collections of works in a single copyright registration "for saving money." Mr. Pazirandeh added that the first publication date of January 15, 2011 represented "when [Unicolors] present[ed] [the designs] to [its] salespeople." But these salespeople are Unicolors employees, not the public. And the presentation took place at a company member-only meeting. Following the presentation, according to Mr. Pazirandeh, Unicolors would have placed non-confined designs in Unicolors's showroom, making them "available for public viewing" and purchase. Confined designs, on the other hand, would not be placed in Unicolors's showroom for the public at large to view.

H&M owns and operates hundreds of clothing retail stores in the United States. In fall 2015, H&M stores began selling a jacket and skirt made of fabric bearing an artwork design named "Xue Xu." Upon discovering H&M was selling garments bearing the Xue Xu artwork, Unicolors filed this action for copyright infringement, alleging that H&M's sales infringed Unicolors's copyrighted EH101 design. Unicolors alleges that the two works are "row by row, layer by layer" identical to each other.

The case proceeded to trial, at which a jury returned a verdict in Unicolors's favor, finding Unicolors owned a valid copyright in the EH101 artwork, H&M infringed on that copyright by selling the contested skirt and jacket, and H&M's infringement was willful. The jury awarded Unicolors $817,920 in profit disgorgement damages and $28,800 in lost profits.

H&M filed a renewed motion for judgment as a matter of law, or in the alternative, for a new trial. The district court denied H&M's renewed motion for judgment as a matter of law, but conditionally granted H&M's motion for a new trial subject to Unicolors accepting a remittitur of damages to $266,209.33. Unicolors accepted the district court's remittitur and the district court entered judgment against H&M accordingly. Unicolors subsequently moved for attorneys' fees and

4

costs, which the district court awarded in the amounts of $508,709.20 and $5,856.27, respectively.

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 959 F.3d 1194, 1195–97 (9th Cir. 2020). On appeal, this panel reversed and remanded the district court's judgment. As a matter of first impression, we interpreted the "single unit of publication" requirement of 37 C.F.R. § 202.3(b)(4)(i)(A) to require "that the registrant [have] first published the collection of works in a singular, bundled collection."[1] *Id.* at 1199. As "the undisputed evidence adduced at trial showed that Unicolors included the inaccurate information 'with knowledge that it was inaccurate,' 17 U.S.C. § 411(b)(1)(A),"[2] we held that Unicolors ran afoul of 37 C.F.R. § 202.3(b)(4)(i)(A). We reversed and remanded the case back to the district court "with instructions to submit an inquiry to the Register of Copyrights asking whether the known

---

[1] As before, the current version of § 202.3(b)(4) refers to registration "as one work" rather than "as a single work." We use the language of the regulation's version effective January 24, 2011, which is the operative version of the regulation in this case.

[2] This provision of the Copyright Act is known as the safe-harbor provision. It states in full that

> A certificate of registration satisfies the requirements of this section and section 412, regardless of whether the certificate contains any inaccurate information, unless—
> > (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and
> > (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411(b)(1).

inaccuracies contained in the '400 Registration, if known to the Register, would have caused it to refuse registration." *Id.* at 1200. Critically, we further held that

> the knowledge inquiry is not whether Unicolors knew that including a mixture of confined and non-confined designs would run afoul of the single-unit registration requirements; the inquiry is merely whether Unicolors knew that certain designs included in the registration were confined and, therefore, were each published separately to exclusive customers.

*Id.* It was on this last point that the Supreme Court vacated this panel's opinion. The Court held that § 411(b), the safe-harbor provision, "does not distinguish between a mistake of law and a mistake of fact. Lack of knowledge of either fact *or law* can excuse an inaccuracy in a copyright registration." *Unicolors*, 142 S. Ct. at 945 (emphasis added). We now revisit this case anew.

## II. STANDARD OF REVIEW

Orders on motions for new trial and remittitur are reviewed for abuse of discretion. *See Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1086–87 (9th Cir. 2014). Factual findings underlying the district court's decision are affirmed unless they are "illogical, implausible or without support in inferences that may be drawn from the record." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). Denials of motions for judgment as a matter of law are reviewed de novo. *See Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 797 (9th Cir. 2017).

We review a district court's decision to admit or exclude evidence for abuse of discretion. *United States v. Plancarte–Alvarez*, 366 F.3d 1058, 1062 (9th Cir.

6

2004). A district court abuses its discretion when it applies the incorrect legal standard or if, akin to a district court's factual findings, its "application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Hinkson*, 585 F.3d at 1262 (internal quotation marks omitted). "Such [evidentiary] rulings will be reversed only if the error more likely than not affected the verdict." *United States v. Liu*, 538 F.3d 1078, 1085 (9th Cir. 2008).

"We review for abuse of discretion the district court's formulation of the [jury] instructions and review de novo whether the instructions accurately state the law." *See Skidmore ex rel. Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1065 (9th Cir. 2020) (en banc). Even if a district court erred in formulating jury instructions, the panel must "consider the issued instructions as a whole," such that "reversal is not warranted if the error is more probably than not harmless." *Id.* (internal quotation marks omitted).

Finally, we review questions of law concerning entitlement to attorneys' fees de novo and factual findings underlying those determinations for clear error. *Thomas v. City of Tacoma*, 410 F.3d 644, 647 (9th Cir. 2005).

### III. ANALYSIS

On appeal, H&M asserts several arguments relating to the district court's handling of this case before, during, and after trial. However, as we previously

noted, a threshold issue was whether Unicolors possessed a valid copyright in the '400 Registration. 17 U.S.C. § 411(a) ("[N]o civil action for infringement . . . shall be instituted until . . . registration of the copyright claim has been made in accordance with this title."); *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010) (Registration is generally required "before suing for copyright infringement."). We therefore first analyze the validity of Unicolors's copyright in its '400 Registration and then we turn to the other arguments H&M raises on appeal.

## A. Unicolors holds a valid copyright in the '400 Registration

### 1. Legal standard under the safe-harbor provision

Because a valid copyright is a precondition for a copyright owner to bring an infringement action in court, the validity of a copyright registration is a pivotal threshold question that a court must resolve before reaching any other issues. The effect of inaccurate information in a registration application on the validity of the registration is governed by the safe-harbor provision, which is codified at 17 U.S.C. § 411(b)(1). As noted above, § 411(b)(1) saves a copyright registration from invalidity when its application contains errors unless the registrant *knowingly* transmitted inaccurate *material* facts to the Register of Copyrights. *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625 n.3 (7th Cir. 2013). The scope of an inaccuracy's materiality is determined by making a statutorily mandated request of "the Register of Copyrights to advise the court whether the inaccurate

8

information, if known, would have caused the Register . . . to refuse registration." 17 U.S.C. § 411(b)(2); *Roberts v. Gordy*, 877 F.3d 1024, 1029 (11th Cir. 2017). Before making such a request, a court must first establish whether the registrant had the proper "knowledge" of the inaccuracy under § 411(b)(1)(A). *DeliverMed*, 734 F.3d at 625 (advising courts to analyze § 411(b)(1)(A)'s requirements prior to making a § 411(b)(2) request to the Register of Copyrights given the provision's "obvious potential for abuse" as a delay tactic); *Beatriz Ball, L.L.C. v. Barbagallo Co.*, 40 F.4th 308, 316 n.5 (5th Cir. 2022) (same). We had previously disagreed with the district court's reasoning that Unicolors lacked the requisite knowledge under the safe-harbor provision because we denied that the statute encoded an "intent-to-defraud requirement" and held that "knowledge" referred only to a registrant's knowledge of the facts not to the registrant's knowledge of the law that the registrant intended to evade. *Unicolors*, 959 F.3d at 1198, 1200 (relying on *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 925 F.3d 1140, 1147 (9th Cir. 2019) for both propositions). The Supreme Court's reversal in this case requires that we revisit both holdings.

First, in contrast to our prior holding, it is now clear that "[l]ack of knowledge of either fact *or law* can excuse an inaccuracy in a copyright registration."

9

*Unicolors*, 142 S. Ct. at 945 (emphasis added).[3] Thus, prior to making a materiality determination, a court must assess if the registrant submitted his application with knowledge that the information was factually inaccurate and with knowledge that the application failed to comply with the governing legal requirements.

However, that does not end matters because the Supreme Court also discussed whether § 411(b) saved a copyright registration from invalidation when there was no "indicia of fraud." *Unicolors*, 142 S. Ct. at 948–49. In the Court's view, whether the safe-harbor provision protected innocent mistakes of law in addition to innocent mistakes of fact constituted "a subsidiary question fairly included in the petition[ for certiorari]'s question presented" regarding fraud, *id.* at 949 (internal quotation marks omitted), because fraud is properly defined as "[a] *knowing* misrepresentation . . . of a material fact," *id.* (quoting Black's Law Dictionary 802 (11th ed. 2019)) (emphasis and alterations in original). This linking of the Court's interpretation of § 411(b) to the legal definition of fraud is in tension with our holding in *Gold Value* as well as our application of that holding in our now vacated opinion. In *Gold Value*, we had rejected the argument that § 411(b) required a showing of an intent to defraud, 925 F.3d at 1147, thereby disagreeing with our sister courts that the 2008 revision of the

---

[3] Because we relied on the same distinction in *Gold Value*, to the extent that its holding concluded that a party's knowledge of the law is irrelevant under § 411(b), it is "clearly irreconcilable" with the Supreme Court's analysis here and is thereby abrogated. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

Copyright Act "codifie[d] the defense of Fraud on the Copyright Office." *Roberts*, 877 F.3d at 1029.[4]

"Fraud on the Copyright Office" was a judicial doctrine that courts had developed under the 1909 Copyright Act to protect registration certificates from invalidity for "inadvertent mistakes" unless "the claimant intended to defraud the Copyright Office by making the misstatement." *Urantia Found. v. Maaherra*, 114 F.3d 955, 963 (9th Cir. 1997) (explaining the universal practice of protecting copyright registrations from innocent mistakes); *see also* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 7.20[B] (Matthew Bender rev. ed. 2022) (same). Although the 1909 Act was no longer in force after Congress revised the statute by enacting the Prioritizing Resources and Organization for Intellectual Property Act of 2008, Pub. L. No. 110–403, 122 Stat. 4256 ("PRO-IP Act"), our court consistently treated the newly added safe-harbor provision as preserving the status quo: § 411(b) became the statutory hook for applying the initially judicially-implied fraud on the Copyright Office doctrine whenever an alleged infringer

---

[4] *DeliverMed*, 734 F.3d at 618, 624, 625 n.3; *cf. Energy Intelligence Grp., Inc. v. Kanye Anderson Capital Advisors, L.P.*, 948 F.3d 261, 267 n.4 (5th Cir. 2020); *Mon Cheri Bridals, Inc. v. Wen Wu*, 383 F. App'x 228, 232 (3d Cir. 2010). Notably, the Copyright Office adopted the same position as our sister courts immediately following the 2008 revision of the Copyright Act. U.S. Copyright Office, *Annual Report of the Register of Copyrights, Fiscal Year Ending September 30, 2008* 13 (2008), https://www.copyright.gov/reports/annual/2008/ar2008.pdf (contending that Congress "amend[ed] section 411 of the copyright law to codify the doctrine of fraud on the Copyright Office in the registration process").

challenged a registration certificate as invalid because the registration application had contained inaccuracies. *See Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 991 (9th Cir. 2017); *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 854 (9th Cir. 2012); *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1259 (9th Cir. 2011).

*Gold Value* and our previous decision in this case took a different tack because the statute employed the word "knowledge" rather than "fraud" when articulating what a challenger would need to show before a court declared a registration invalid. 925 F.3d at 1147 & n.4. But, we were able to find a distinction between fraud and knowledge only by concluding that the statute required knowledge of solely factual errors regardless of a party's knowledge of the law: a registrant could have knowledge of the inaccuracy by being aware of the facts without intending to defraud the Copyright Office by presuming—incorrectly—that those facts complied with the relevant legal requirements. *Id.* at 1147 ("[T]he term 'knowingly' does not necessarily have any reference to *a culpable state of mind* . . . [and] 'the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law.'" (emphasis added) (quoting *Bryan v. United States*, 524 U.S. 184, 192 (1998) (citations omitted))). However, because we now know § 411(b) requires knowledge of both mistakes of law and of fact, there is no daylight between

a court's determination that a party had knowledge of the legal and factual inaccuracies and a finding that the party committed fraud on the Copyright Office.

As the Supreme Court explained, our prior analysis was erroneous because treating § 411(b) as not excusing inadvertent legal errors meant that our holding did not "always require knowledge of the misrepresentation in the registration application," as is required by statute, and which the Court explained is the equivalent of not "requir[ing] the typical elements of fraud." *Unicolors*, 142 S. Ct. at 949. And the Court reached this conclusion by finding that Congress's passage of the PRO-IP Act did not upset the prior caselaw's application of fraud on the Copyright Office under the 1909 Copyright Act. *Id.* at 947–48. After favorably quoting our explanation of the doctrine in *Urantia* and noting its widespread adoption, the Court held that there was "no indication that Congress intended to alter this well-established rule when it enacted § 411(b)." *Unicolors*, 142 S. Ct. at 947–48 (quoting *Urantia*, 114 F.3d at 963). Thus, rather than upend the framework by using the word "knowledge," as we held in *Gold Value* and applied in our prior decision in this case, the Supreme Court's analysis further suggests that the PRO-IP Act codified this doctrine in the safe-harbor provision. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 813 (1989) ("When Congress codifies a judicially defined concept, it is presumed, absent an express statement to the contrary, that Congress intended to adopt the interpretation placed on that concept by the courts.").

Thus, the clear implication of the Supreme Court's holding in this case is that a proper construction of the safe-harbor provision's broad protection of copyright registrants leads to the conclusion that the PRO-IP Act was intended to codify the fraud on the Copyright Office doctrine.[5]  As a result, our holding in *Gold Value*— and our prior reliance on it—is clearly irreconcilable with the Supreme Court's analysis and thus has been abrogated to the extent that it held that the safe-harbor provision does not require a showing of fraud.  *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

We therefore hold that a party seeking to invalidate a copyright registration under § 411(b) must demonstrate that (1) the registrant submitted a registration

---

[5] We note that this comes with two small caveats.  First, a colorable argument might have been made under the original fraud on the Copyright Office doctrine that a registration should be invalidated when it contained nonmaterial "clerical error[s]" and was "[]accompanied by fraud."  *Advisers, Inc. v. Wiesen-Hart, Inc.*, 238 F.2d 706, 708 (6th Cir. 1956).  But that outcome is unambiguously foreclosed by the language in the safe-harbor provision, which invalidates a registration only if the knowing misrepresentations are *material*.  17 U.S.C. § 411(b)(1)(B) (requiring a court to find that the error "if known, would have caused the Register of Copyrights" to change the registration decision).  Second, our holding in *Urantia* introduced prejudice to the alleged infringer as another means for a court to invalidate a copyright when the registration application contained inaccurate information.  114 F.3d at 963 (holding that innocent mistakes "do not invalidate a copyright . . . unless the alleged infringer has relied to its detriment on the mistake").  But for the same reason as the previous caveat, this prior holding is foreclosed: "[p]rejudice has no relevance to the fraud on the Copyright Office inquiry" under the provision's unambiguous language.  *DeliverMed*, 734 F.3d at 625 n.3; *cf. Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1714 (2022) (relying on the Federal Arbitration Act's unambiguous language to hold that courts should not imply a prejudice requirement when evaluating whether a party waived his right to compel arbitration).

14

application containing inaccuracies, (2) the registrant knew that the application failed to comply with the requisite legal requirements, and (3) the inaccuracies in question were material to the registration decision by the Register of Copyrights. *Roberts*, 877 F.3d at 1030. Put differently, a registration is invalid under § 411(b) if the registrant perpetrated fraud on the Copyright Office by knowingly misrepresenting material facts.

## 2. Existence of the inaccuracy in Unicolors's '400 Registration

Thus, to evaluate the validity of Unicolors's '400 Registration, our first step is to assess whether its application contained an inaccuracy. Our previous decision in this case evaluated this question by analyzing what, at the time, was a matter of first impression: "what it means to publish multiple works as a 'single unit'" under 37 C.F.R. § 202.3(b)(4)(i)(A). *Unicolors*, 959 F.3d at 1199. We ultimately concluded that "the plain meaning of 'single unit' in § 202.3(b)(4)(i)(A) requires that the registrant first published the collection of works in a singular, bundled collection." *Id.* While our previous opinion in this case has been vacated, our "single unit" holding was not implicated in the Supreme Court's vacatur, and we see no reason to depart from our earlier determination on this point.

As we previously noted:

The relevant language of the regulation provides, in full:

15

> For the purpose of registration on a single application and upon payment of a single registration fee, the following shall be considered a single work:
>
> (A) In the case of published works: all copyrightable elements that are *otherwise recognizable as self-contained works*, that are *included in a single unit of publication*, and in which the copyright claimant is the same[.]

37 C.F.R. § 202.3(b)(4)(i)(A) (emphasis added). The plain meaning of the word "single" unsurprisingly commands a sense of singularity. *See Single*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/single (defining "single" as "unaccompanied by others"). The plain meaning of "unit" is no different. *See Unit*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/unit (defining "unit" as "a single thing, person, or group that is a constituent of a whole"). Together, the two words suggest that a "single unit of publication" refers to some singular, bundled item that contains all works identified in the registration.

The proverbial toolkit of statutory interpretation reinforces that a collection of published works that make up "a single unit of publication" must have been first published as part of some singular, bundled collection. The principle of *noscitur a sociis*—"it is known by its associates" or "birds of a feather flock together"—instructs that words in statutes are given more precise content by neighboring words. *See Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734, 740 (2017); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 195–98 (2012) (describing *noscitur a sociis* and explaining its meaning as "birds of a feather flock together"). Here, § 202.3(b)(4)(i)(A) refers to "copyrightable *elements* that are *otherwise* recognizable as *self-contained works*, which are included in a single unit of publication." (emphasis added). By referring to "elements" that are "otherwise . . . self-contained works," the regulation unambiguously contemplates that a "single-unit of publication" does not cover separate self-contained works, but instead covers the unification of such works that otherwise could be self-contained.[3]

> [FN 3] Even if the term "single unit" were ambiguous, we would hold the term has the same meaning. If it were ambiguous, we

16

would look to how the U.S. Copyright Office has defined the term in its internal manual, *Compendium of Copyright Office Practices* ("*Compendium*"), which is entitled to *Skidmore* deference. *Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 755 F.3d 1038, 1041–42 & n.2 (9th Cir. 2014). The *Compendium* details that the "single unit of publication" option applies to a collection of published works "first distributed to the public in the packaged unit." *Compendium* § 1103. In other words, a single unit of publication refers to separately copyrightable works "that are physically bundled together and distributed to the public as a unit, such as a board game containing instructions, a game board, and sculpted playing pieces." *Id.* The *Compendium*'s definition for "single unit" thus aligns with what we ascribe as its unambiguous and plain meaning.

For these reasons, we hold that a collection of works does not qualify as a "single unit of publication" unless all individual works of the collection were first published as a singular, bundled unit. Therefore, it is an inaccuracy for a registrant like Unicolors to register a collection of works (such as the works identified in the '400 Registration) as a single-unit publication when the works were not initially published as a singular, bundled collection. At a minimum, the confined works included in the '400 Registration were initially made available only to individual, exclusive customers.

*Unicolors*, 959 F.3d at 1199–1200 (emphases in original). Therefore, we again conclude that Unicolors's '400 Registration contained an inaccuracy.

### 3. Unicolors's knowledge of the inaccuracy

Our analysis regarding the second step—whether Unicolors submitted the application knowing it contained errors—is where we depart from our previous decision in this case. Normally, we would be required to remand to the district court to make a finding of fact regarding Unicolors's knowledge about its legal obligations under the single unit rule when it submitted the '400 Registration application. *But*

17

*see Jules Jordan Video, Inc. v. 144942 Can. Inc.*, 617 F.3d 1146, 1156–57 (9th Cir. 2010) (making a finding of fact *on appeal* that the registrant did not have an intent to defraud). But the district court expressly concluded that H&M failed to make "any showing that Unicolors intended to defraud the Copyright Office." And as we explained above, under the correct reading of the safe-harbor provision in light of the Supreme Court's ruling, *see supra* Section III.A.1, a court's § 411(b) finding regarding a registrant's lack of intent to defraud is also a § 411(b) finding regarding the registrant's lack of knowledge that his copyright application contained inaccuracies—factual or legal. Thus, the district court determined that Unicolors lacked knowledge that it submitted inaccuracies with its application and as a result, that its '400 Registration is entitled to the safe-harbor provision's protection. The district court did not abuse its discretion in making this determination.

To begin with, our prior ruling on the proper interpretation of "a single unit of publication" in 37 C.F.R. § 202.3(b)(4)(i)(A) was the first binding precedent in the Circuit on the matter. It is hardly unreasonable to conclude that Unicolors could not have knowingly violated our interpretation of the relevant regulation before we announced it. Although "willful blindness may support a finding of actual knowledge," *Unicolors*, 142 S. Ct. at 948, this case does not present a context where Unicolors has taken a legal position that egregiously misapplies a clear statute. The only other circuit court precedent on the single unit issue did not directly construe

18

the provision and permitted a single registration of multiple works even though they were not "related." *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 205–06 (3d Cir. 2005). And the version of the internal manual published by the Copyright Office in existence at the time Unicolors submitted its '400 Registration application did not provide meaningful guidance to registrants regarding the meaning of the term "single unit," because it simply restated the statute using different wording. U.S. Copyright Office, Compendium of U.S. Copyright Office Practices ("*Compendium II*") § 607.01 (2d ed. 1988).[6] Moreover, the district court held, albeit erroneously, that Unicolors had indeed complied with 37 C.F.R. § 202.3(b)(4)(i)(A) by "publishing" the confined designs in the '400 Registration at the same time as it did the unconfined designs. *Unicolors, Inc. v. Hennes & Mauritz L.P.*, No. 16-cv-02322-AB (SK), 2018 WL 10307045, at *3 (C.D. Cal. Aug. 1, 2018). Given that our prior holding was new binding precedent and that the issue was truly unsettled at the time, as evidenced by the district court's contrary conclusion below, we can draw a sensible inference that Unicolors did not know that its '400 Registration application would run afoul of the single unit requirement. *See Archie MD, Inc. v.*

---

[6] In fact, the U.S. Copyright Office recently appeared to share the concern that was repeatedly expressed in public feedback that the definition of "publication" was too difficult for lay individuals to parse and to apply. The Office sent out a notice of inquiry that identified its interest in drafting new regulations that would assist registrants in determining whether works to be registered together were deemed published or unpublished. Notification of Inquiry, U.S. Copyright Office, 84 Fed. Reg. 66,328 (Dec. 4, 2019).

*Elsevier, Inc.*, 261 F. Supp. 3d 512, 520 (S.D.N.Y. 2017) (holding that a registrant lacked knowledge of the inaccuracy in an application because "whether the Work had been published . . . was an unsettled legal question at the time the [registrant] sought" registration).

H&M points to two facts to support its contention that Unicolors committed fraud—that is to say a knowing misrepresentation of a material fact—when submitting the '400 Registration: (1) that Unicolors knew it combined confidential and public designs together in its registration application, and (2) that Mr. Pazirandeh testified that the registration was submitted as a bundle partly to "sav[e] money." Relying on the first factual contention does not help H&M to demonstrate that Unicolors had knowledge of the *legal* requirements applicable to its application because it speaks only to Unicolors's factual knowledge of the mistake in its application. *Unicolors*, 959 F.3d at 1200.

In addition, H&M's characterization of Mr. Pazirandeh's testimony as proof that Unicolors's bundled submission was a fraudulent money grab overstates the inferences that can be drawn from that admission in light of the other evidence in the record. Certainly, it is not unheard of for a party to cut legal corners to save a few dollars. But this is not such a context. Given that there was legal uncertainty over how a court would rule on the single-unit requirement at the time Unicolors submitted its application, it would be reasonable to infer that Mr. Pazirandeh

20

evaluated several plausible legal interpretations of the single unit rule and chose the least expensive course of action to minimize Unicolors's costs—as would any profit-motivated businessperson.

This less nefarious reading of Mr. Pazirandeh's testimony is bolstered by his other answers to the same line of questioning. He testified that the designs in the '400 Registration were bundled together because "collectively the[ designers] thought that these florals and . . . ethnics . . . [we]re going to be successful" and were "going to go to public [sic]." And he explained that Unicolors had a consistent practice of presenting designs, which the designers anticipated registering together, as one group to Unicolors's salespeople. Contrary to H&M's narrative, these statements, when combined with the lack of a clear legal interpretation of the single unit rule, sensibly create the impression that Mr. Pazirandeh believed the mix of published and unpublished designs merited being bundled together in line with Unicolors's past, consistent practice.

Thus, the district court's conclusion that Unicolors did not know it submitted a registration application that contained false information because it lacked an intent to defraud the Copyright Office is plausibly supported by inferences drawn from the facts in the record and follows logically from the fact that the single-unit issue was an unsettled question of law at the time that the '400 Registration was submitted. Therefore, we affirm the district court's decision regarding the '400 Registration

because its finding that Unicolors did not have the requisite knowledge of its application's inaccuracy per § 411(b)(1)(A) is not clearly erroneous. *See Hinkson*, 585 F.3d at 1262. This lack of knowledge means that the '400 Registration falls within the ambit of the safe-harbor provision's protection, notwithstanding its failure to comply with the single unit requirement. Thus, Unicolors's copyright is valid.

***

Because the '400 Registration is valid, Unicolors can maintain its infringement action against H&M over the EH101 design, which is covered by that registration. As a result, we are able to reach H&M's other challenges.

## B. H&M's remaining challenges

H&M asserts several challenges to various aspects of the district court proceedings below.

### 1. H&M's pretrial challenges

H&M asserts that the district court committed errors relating to three motions in limine: error in the denial of H&M's motion in limine to exclude any expert testimony from Mr. Pazirandeh about the similarities between EH101 and the Xue Xu design printed on H&M's garments; and error in the granting of Unicolors's two motions in limine to exclude H&M's proffered expert testimonies of Robin Lake and Justin Lewis.

(a) Mr. Pazirandeh's testimony

Concerning Mr. Pazirandeh, H&M asserts that despite Unicolors's representations that he would not proffer expert testimony, he did just that. Namely, H&M argues that Mr. Pazirandeh's testimony regarding substantial similarity, which is one aspect of the analysis conducted under the unlawful appropriation component of an infringement claim, constituted an opinion by an expert not properly designated and which should have been excluded. However, H&M has forfeited the right to bring this challenge by failing to object, or to move to strike, at trial when Mr. Pazirandeh's statements purportedly shifted from lay testimony to that of an expert.

As noted above, H&M filed a motion in limine before trial seeking to exclude any expert testimony from Mr. Pazirandeh about the similarities between the works. H&M's motion claimed that in Mr. Pazirandeh's deposition, he testified about the similarities between the works at a level of detail requiring expert credentials that he lacked. Thus, H&M sought to prevent Mr. Pazirandeh from offering similar testimony at trial by its motion in limine. At the hearing on the motion in limine, Unicolors's counsel expressly disclaimed any intent to solicit expert testimony from Mr. Pazirandeh. Unicolors's counsel explained that he intended only to ask Mr. Pazirandeh to make statements that would amount to no more than "[t]his lawsuit

23

was brought because I saw something that looks very similar to me." H&M did not object that the testimony as to what motivated the lawsuit was irrelevant.

Based on these arguments, the district court largely agreed with H&M and held that Mr. Pazirandeh would not be permitted to proffer an expert opinion at trial. But, relying on Unicolors's counsel's representations, the court also determined that if Mr. Pazirandeh were to say "I saw this. It looks similar; so I am suing," the statement would constitute lay testimony and would be permissible. Thus, the district court allowed Mr. Pazirandeh to testify subject to the caveat that if his testimony were to stray beyond that lay testimony, the court would "revisit the issue." And the district court even advised H&M that "[i]f the testimony comes in differently, you can revisit it at that time."

At trial, Mr. Pazirandeh made five statements that H&M now argues on appeal constituted expert testimony—each statement made without an objection or motion to strike the statement from the record by H&M:

- He testified that "in comparing" Xue Xu with EH101, he "saw that all the elements lined up";
- He testified that "the design" on a garment bearing EH101 was "identical" to the Xue Xu artwork;
- He testified that the Xue Xu design printed on H&M's merchandise was "identical" to a garment bearing EH101;
- He testified that based on his "25 years of experience" it would be "absolutely impossible" to produce the Xue Xu design printed on H&M merchandise "without seeing [EH101]";
- He testified that "somebody at H&M, either their [sic] suppliers or somebody saw [EH101] and knocked it off."

24

H&M contends that these statements were "expert testimony of exactly the type the motion [in limine] had sought to exclude."

But regardless whether these statements constituted expert opinion testimony, H&M overlooks the fact that it failed to preserve any claimed error for appeal to such statements. H&M simply did not object nor move to strike any of these five statements as Federal Rule of Evidence 103(a)(1)(A) requires. Nor could H&M argue that it need not have objected nor moved to strike them from the record due to the district court's pretrial ruling on H&M's motion in limine, as there was no "definitive" ruling as to the admissibility of the statements on the record. *See* Fed. R. Evid. 103(b). The district court had carefully explained that it would permit barebones testimony from Mr. Pazirandeh akin to stating that "I saw this. It looks similar; so I am suing." And it stated that it would revisit the issue—and importantly that H&M should raise objections as needed—if Mr. Pazirandeh went beyond the narrow bounds permitted.

Thus, to preserve the error to be reviewable on appeal, H&M was required to raise a timely objection to any of Mr. Pazirandeh's testimony that ultimately went beyond the scope of the district court's pretrial in limine ruling to obtain a "definitive" ruling on the record. *United States v. Wells*, 879 F.3d 900, 930 (9th Cir. 2018) (explaining that only challenges "thoroughly explored pretrial" and rejected by a district court are "preserved for appeal"). And because Mr. Pazirandeh's

statements purportedly strayed, H&M could not rest on its prior objection; it had to renew that objection at trial or move to strike Mr. Pazirandeh's testimony. *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1070 (9th Cir. 2017) ("When a district court makes a pretrial ruling on a motion in limine that is subject to limitations regarding how the evidence actually comes in, and if the testimony stays within those parameters, only then no additional objection is necessary." (internal alterations and quotation marks omitted)).

H&M failed to do either. Therefore, it has forfeited any claim of error on appeal based on a claim that Mr. Pazirandeh's statements constituted impermissible, undesignated expert opinion.

(b) The exclusion of expert witnesses Robin Lake and Justin Lewis

*(i) H&M's challenge to the district court's exclusion of Ms. Lake*

H&M next argues that the district court abused its discretion in granting Unicolors's motion in limine to exclude expert testimony from H&M's expert, Robin Lake, on the issue of substantial similarity of the EH101 and the Xue Xu designs. H&M disclosed Ms. Lake after the court-ordered initial-expert-disclosure deadline of April 7, 2017 and instead designated her as its "rebuttal" expert. Unicolors filed a motion in limine to exclude Ms. Lake's expert testimony as untimely under Federal Rules of Civil Procedure 26 and 37.

Rule 26 provides that parties must disclose expert testimony "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Rule 37 provides that a party who fails to disclose expert testimony in compliance with Rule 26 "is not allowed to use that . . . witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 37(c)(1) "gives teeth" to Rule 26's disclosure and supplementation requirements. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). "The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless." *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1246 (9th Cir. 2012).

In opposition to Unicolors's motion in limine, H&M conceded that its disclosure was untimely but argued that it was both substantially justified and harmless, by contending that the fault for the delay actually lay with Unicolors. H&M asserted that its delay was substantially justified because it had no need of an expert witness until Unicolors presented declarations alongside its motion for summary judgment containing "opinion testimony regarding the alleged similarity of the designs" and Mr. Pazirandeh made similar statements during his deposition. H&M also argued that it was harmless because any prejudice to Unicolors was "self-inflicted" by its failure to take Ms. Lake's deposition during the two weeks preceding the expert discovery cutoff deadline and its failure to request that H&M stipulate to

27

allowing Unicolors's designation of a rebuttal expert during the seven months prior to trial.

The district court resolved the motion in limine in Unicolors's favor. It highlighted that H&M's arguments were derivative of H&M's contentions that Unicolors's lay witnesses, Mr. Pazirandeh and Ms. Lim, would offer veiled expert testimony. And it concluded that because Unicolors failed to designate an expert witness and its counsel disclaimed any interest in soliciting expert testimony at trial, Ms. Lake's late disclosure was not substantially justified because she had no expert testimony to rebut as H&M's "rebuttal" expert witness. The district court further held that because of her "rebuttal" designation, the lack of timely disclosure could not be harmless under Rule 37 because Unicolors "likely had little reason to attempt to depose [Ms. Lake], knowing that it did not plan to offer expert testimony that she could rebut." It explained to both parties, however, that its decision could be revisited if Unicolors's witnesses did provide expert opinions while on the witness stand. As noted above, at trial, after Mr. Pazirandeh testified to what H&M currently contends amounted to expert opinion testimony, H&M failed to object to Mr. Pazirandeh's statements of opinion or to move that they be stricken from the record. Further, H&M did not then proffer Ms. Lake's expert testimony to rebut Mr. Pazirandeh's purported expert opinion. Either such an objection or such a proffer

28

would have required the district court to reevaluate its decision on Unicolors's motion in limine.[7]

On appeal, H&M restates the arguments it made before the district court. But H&M introduces one twist to its substantial justification argument on appeal. It claims that Mr. Pazirandeh's trial testimony is a further reason to conclude H&M's late disclosure was substantially justified because the testimony in fact incorporated expert opinions Mr. Pazirandeh was not permitted to make.

While H&M would have a colorable claim had Unicolors been permitted to proffer expert testimony at trial, the district court's ruling prohibiting Unicolors's lay witnesses from presenting expert testimony undermines its argument. During the motion in limine hearing, the district court acknowledged that Mr. Pazirandeh's declarations and deposition testimony could be viewed as expert testimony and was inclined to agree that Ms. Lake should be permitted to testify:

> It looks like there was a little bit of chess going on here. Plaintiff made the decision not to call an expert, but it looks like . . . [it is] trying to bring in expert-like testimony through other witnesses. If that's the case, then it would seem to me that would open the door to have Miss Lake testify.

---

[7] During the trial proceedings, H&M expressly anticipated making a motion to have Ms. Lake testify "depending on how the evidence comes in." But as the trial progressed, H&M made only one objection regarding Ms. Lake that is not relevant here—that objection was limited to the court's determination that Ms. Lake could not observe other witness testimony. In fact, after this ruling, which was made before opening statements, H&M did not mention Ms. Lake again during the trial proceedings.

But once Unicolors's counsel represented its intention to limit Mr. Pazirandeh to just lay testimony, the district court found that H&M's need for Ms. Lake's expert testimony was no longer necessary. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii) (setting disclosure deadlines for "evidence [that] is intended solely to contradict or rebut evidence *on the same subject matter identified by another party*" (emphasis added)). This lack of expert opinion evidence for Ms. Lake to rebut negates any reason H&M may have had for being substantially justified in its late disclosure—Ms. Lake's expert testimony was rendered moot. Thus, the district court did not abuse its discretion when it excluded Ms. Lake from trial.

H&M's attempt to avoid this result by contending that Mr. Pazirandeh's actual trial testimony substantially justified Ms. Lake's late disclosure is also unsuccessful. Although H&M forfeited its argument that several of Mr. Pazirandeh's statements constituted expert testimony that should have been struck from the record, *see supra* Section III.B.1.a, H&M appears to be making the argument here that it should have been permitted to have Ms. Lake testify as a rebuttal witness once the jury heard Mr. Pazirandeh's purported expert opinion testimony. However, H&M has forfeited this argument as well. H&M is certainly correct that the district court concluded that if Mr. Pazirandeh made statements at trial that were properly understood as expert opinion, H&M would be permitted to rebut that testimony with its own expert witness. But the court's pretrial admonition is insufficient to render this claim

meritorious because, following Mr. Pazirandeh's testimony, H&M failed to make a motion to introduce rebuttal evidence and it failed to proffer Ms. Lake's testimony as rebuttal evidence. Had H&M wanted Ms. Lake to rebut what it perceived as undesignated expert testimony from Mr. Pazirandeh at trial, it had an obligation to raise that issue to the district court judge *at trial*. Because H&M did nothing to revive this claim, it has forfeited this argument as well. Thus, H&M cannot demonstrate that its late disclosure of Ms. Lake was substantially justified for either of the reasons it suggests.

H&M's final argument regarding harmlessness is equally unavailing. By restating its contention that Unicolors's failure to depose Ms. Lake or obtain its own rebuttal expert during the lapse of seven months between Ms. Lake's disclosure and trial suggests that any prejudice was self-imposed, H&M misapprehends the district court's reasoning. The district court concluded that the prejudice to Unicolors was H&M's doing, because H&M designated Ms. Lake as a *rebuttal* expert. As the district court explained, "because Ms. Lake was confusingly designated as a rebuttal expert, Plaintiff *likely had little reason to attempt to depose her, knowing that it did not plan to offer expert testimony* that she could rebut." Rather than ignore H&M's retort that Unicolors caused its own prejudice, the district court responded with a reasonable explanation for why Unicolors failed to act on H&M's late disclosure.

31

As this holding is grounded in a sensible reading of the record, the district court did not abuse its discretion in finding that Ms. Lake's late disclosure was not harmless.

For these reasons, the district court did not abuse its discretion in excluding Ms. Lake's expert testimony.[8]

*(ii) H&M's challenge to the district court's exclusion of Mr. Lewis*

H&M also sought to introduce expert testimony from Mr. Lewis on the issue of damages, specifically on how the jury was to measure the profits to be disgorged by H&M, if the jury found H&M liable (as it ultimately did). As with Ms. Lake, H&M disclosed Mr. Lewis's testimony after the initial-expert-disclosure deadline and designated him a "rebuttal" expert. And, just as was the case with Ms. Lake, the district court, in response to Unicolors's disclaiming any intention of proffering

---

[8] H&M argues separately that "[i]t was further error to exclude" Ms. Lake's testimony from trial because she was "the only designated expert that was qualified to speak to the extrinsic test." The extrinsic test is one prong of the two-part test a plaintiff must satisfy when trying to prove the copying element of his infringement claim by circumstantial evidence. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481, 485 (9th Cir. 2000), *overruled on other grounds by Led Zeppelin*, 952 F.3d at 1066. The extrinsic test requires that the factfinder conduct an objective comparison of the elements of the two works to determine their objective similarity. *Id.* at 485. This contrasts with the other prong of the copying element, the intrinsic test, where the factfinder makes a subjective comparison of the two works to determine whether the works create a subjective impression that they are substantially similar. *Id.* Contrary to H&M's arguments, no expert testimony is required to perform the extrinsic test when the works at issue are readily understandable to a jury. *See, e.g.*, *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1118–19 (9th Cir. 2018) (involving two photographs).

expert testimony regarding H&M's profits at trial, excluded Mr. Lewis as a rebuttal witness because he would have no evidence to rebut.

As it did before the district court below as well as in its arguments regarding Ms. Lake, H&M contends that its late disclosure was substantially justified. It asserts that it did not know it needed Mr. Lewis's expert opinion until Unicolors submitted a motion for summary judgment that included a declaration from Unicolors's then attorney, which detailed a calculation measuring H&M's gross revenue from the sale of garments with the Xue Xu design. Although H&M frames its other argument indirectly, it also appears to argue that Mr. Lewis's late disclosure was harmless because Unicolors had sufficient time to depose him before trial.

Akin to our resolution of H&M's argument regarding Ms. Lake, we hold that the district court did not abuse its discretion in excluding Mr. Lewis's expert testimony. Although Unicolors's then attorney did include a calculation regarding H&M's gross revenues from Xue Xu products in a declaration attached to Unicolors's summary judgment motion, Unicolors disclaimed any intention of having its witnesses testify to H&M's profits at trial.[9] Furthermore, Unicolors

---

[9] Although Unicolors did not put any witness on the stand to testify to H&M's profits, the over $800,000 disgorgement award, *see infra* Section III.B.3.a.iv, was not lacking in some evidentiary foundation. H&M stipulated to the number of units of Xue Xu products it sold, and Unicolors introduced into evidence the sales price of those products, *see infra* note 10. Furthermore, Unicolors also introduced into evidence two packing lists, a purchase order, and a document produced by H&M

33

explained that its testimony regarding calculating damages would come from Mr. Pazirandeh and would be limited to testimony regarding *Unicolors's* lost profits.[10] But Mr. Lewis's expert report explained that he did not offer an analysis of Unicolors's lost profits and instead focused solely on how to measure *H&M's* profits for determining possible disgorgement damages. Unicolors did not adduce any expert opinion testimony as to H&M profits to be disgorged.[11] Had the district court permitted Mr. Lewis to testify as a rebuttal expert, he would have had no expert opinion evidence to rebut. Just as with Ms. Lake's testimony, this dispels H&M's asserted substantial justification.

And as with Ms. Lake's testimony, the district court did not abuse its discretion in concluding that Unicolors was prejudiced by Mr. Lewis's late

---

purporting to show sales, as well as portions of the deposition testimony from H&M's Chief Financial Officer, *see infra* note 25, who had explained how H&M documented its sales numbers. As the sales price of the Xue Xu products and the number of units sold can be used to calculate H&M's gross revenue from the Xue Xu products with nothing more than simple arithmetic, Unicolors satisfied its burden in proving disgorgement damages, even without placing an expert damages witness on the stand. *See* 17 U.S.C. § 504(b) ("In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue.").
[10] At the motion in limine hearing, Unicolors did represent that it intended to ask Mr. Pazirandeh about the price tag on H&M's infringing products, and that testimony was presented to the jury. However, Mr. Pazirandeh was simply asked to report the number found on the price tag displayed in each exhibit and was not asked to perform any calculation of damages. And H&M does not rely on this testimony as the basis for its arguments regarding Mr. Lewis.
[11] Whatever expert testimony was adduced in the affidavits in opposition to Unicolors's motion for summary judgment, those affidavits were not received in evidence in the trial.

34

disclosure. The record supports its conclusion that because Mr. Lewis was styled a "rebuttal" expert and because Unicolors had no intention of putting a damages expert on the stand to proffer opinions as to H&M's profit to be disgorged, Unicolors had a sufficient reason not to depose Mr. Lewis. For this reason, Mr. Lewis's late disclosure was not harmless.[12]

\*\*\*

Therefore, we conclude that the district court did not abuse its discretion in any of the pretrial rulings H&M challenges.

### 2. H&M's at-trial challenges

H&M asserts that the district court committed three errors during the trial itself. First, H&M argues that the district court erred in refusing to instruct the jury that the Xue Xu design was presumptively independently created on account of a judicially noticed Chinese copyright in that design. Second, H&M argues that the district court erred by refusing to admit into evidence Shaoxing County DOMO Apparel Co., Ltd.'s ("DOMO") U.S. copyright registration of the Xue Xu design. Third, H&M argues that the district court erred by admitting into evidence Unicolors's proffer of a physical garment exemplar bearing a black-and-white

---

[12] Unlike its argument regarding Ms. Lake, H&M does not contend on appeal that Unicolors's lay witnesses provided expert testimony. But even if it had, that argument would also fail. H&M conceded that Mr. Pazirandeh's proposed testimony about lost profits was not expert testimony. And it did not object to or move to strike any of that testimony at trial.

(rather than color) version of EH101, which had not been produced during discovery, although it had been adequately designated and requested for production.

(a) H&M's challenge regarding its Chinese copyright jury instruction

H&M's first at-trial challenge concerns the district court's handling of the Chinese copyright and DOMO's ownership of the Xue Xu design.

As part of its defense, H&M argued that its sale of clothing with the Xue Xu design could not constitute infringing behavior, because DOMO owned a copyright in that design. To substantiate this claim, H&M submitted records from China and offered Ms. Qian, the purported creator of the Xue Xu design, as a witness to testify at trial as to her work. Although Ms. Qian did not end up testifying, the proffered documentation admitted into evidence showed that DOMO's copyright was registered on September 22, 2015, which was more than four years after Unicolors successfully registered its '400 copyright in the United States. The district court also instructed the jury regarding its decision to admit this evidence by explaining that "[t]he Court has decided to accept the facts that Exhibits 101 and 102 contain a Chinese copyright registration for the Xue Xu work, obtained by Shaoxing County DOMO Apparel CO., Ltd."

However, H&M contended that it was entitled to have the jury further instructed on the proper legal treatment of the DOMO copyright. It argued at length to the district court that Chinese copyrights are entitled to the same protections as

U.S. copyrights under the Berne Convention and that, under Chinese law, the existence of a copyright registration created the same presumption of originality in the copyrighted work that Unicolors claimed in its U.S. copyright. Based on this understanding of the Berne Convention and Chinese law, H&M requested two instructions that the district court ultimately refused to provide.[13] The first requested instruction would have been appended to what eventually became Jury Instruction No. 27 and related to the parties' evidentiary burdens.[14] This first requested instruction stated in relevant part:

> Domo is the owner of a valid copyright in its Xue Xu artwork if H&M proves by a preponderance of the evidence that:
>
> 1. Xue Xu is original; and

---

[13] H&M's brief also cites to a third jury instruction that it requested that would have explained to the jury that both EH101 and Xue Xu were copyrightable works. Although the district court did not ultimately provide the requested instruction, H&M does not meaningfully dispute the fact that the jury was properly instructed that Xue Xu could be copyrighted. It therefore has forfeited this argument. *Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 570 (9th Cir. 2018) (A party forfeits "[i]nadequately briefed and perfunctory arguments."). But even if the argument were not forfeited, we would find that it lacks merit. The district court's jury instruction explaining that it was taking judicial notice of DOMO's Chinese copyright expressly noted that the jury was to "accept the fact that [DOMO had obtained] . . . a Chinese *copyright registration* for the Xue Xu work."

[14] Jury Instruction No. 27 stated as follows:

> Unicolors is the owner of a valid copyright in Unicolors' EH101 artwork if it proves by a preponderance of the evidence that:
>
> 1. Unicolors' work is original; and
> 2. Unicolors is the author or creator of the work or received a transfer of the copyright.

2. Domo is the author or creator of the work or received a transfer of the copyright.

The second requested instruction related to the presumption of validity given to copyright registration certificates and would have modified what eventually became Jury Instruction No. 28.[15]  This second requested instruction stated in relevant part:

> The evidence in this case also includes Exhibit ___, a certificate of copyright registration from the Zhejiang Provincial Copyright Administration of China, which carries the same legal effect, and affords the copyright holder the same rights and enforceability as a registration issued by the U.S. Copyright Office. From this certificate a presumption is created that the copyrighted design Xue Xu is the original and copyrightable work of the author DOMO Apparel and that the DOMO Apparel owns the copyright in that work.  Plaintiff may rebut this presumption if it shows by a preponderance of the evidence that the copyright is invalid, the work is not original, DOMO Apparel is not the author or that DOMO Apparel is not the owner.

The district court declined to provide these instructions, because although U.S. copyright law permits solely "original works to be copyrighted," the court knew of no similar originality requirement for a work "to be copyrighted in China."  The

---

[15] Jury Instruction No. 28 stated as follows:

> A copyright owner may obtain a certificate of registration from the Copyright Office.

> The evidence in this case includes Exhibit 32, a certificate of copyright registration from the Copyright Office.  From this certificate you may, but need not, conclude that the copyrighted design EH101 is the original and copyrightable work of the author and that Unicolors owns the copyright in that work.  If H&M shows by a preponderance of the evidence that the copyright is invalid or that EH101 is not original, you should conclude that Unicolors does not own a valid copyright in EH101.

district court further explained that even assuming that DOMO's copyright merited a presumption of validity, H&M was not entitled to the instructions because H&M "failed to establish a connection between the Chinese copyright registration and its own garments."

On appeal, H&M relies on the Berne Convention and one Chinese case to contend that the district court misconstrued Chinese copyright law and that such an originality presumption exists if a party presents a valid Chinese copyright registration to the court. To assess the merits of H&M's contentions, we begin by reviewing the Berne Convention and its protection of foreign copyrights in domestic infringement suits. We then review each proposed instruction.

*(i) Foreign copyrights under the Berne Convention*

Because copyright law has international implications, the Berne Convention was an international accord that set the standards governing international copyright relations. *Golan v. Holder*, 565 U.S. 302, 306 (2012). H&M correctly notes that because the United States joined the Berne Convention, it is required to "afford[] [foreign copyright holders] the same protection as holders of domestic copyrights." *Fahmy v. Jay-Z*, 908 F.3d 383, 391 & n.12 (9th Cir. 2018) (internal quotation marks omitted). However, this protection serves only the narrow purpose of equal treatment because it simply means that foreign copyright holders are subject to the same U.S. copyright law analysis as domestic copyright holders. *Id.* at 391. Put

another way, we are not to discount a foreign copyright on account of its foreign origin. But it does not mean we can change the rules of the game simply because foreign copyright law is implicated. For this reason, we held in *Fahmy* that the Berne Convention was of no help to the heir of an Egyptian composer, who argued that Egyptian law enabled him to raise a moral objection to an American rapper's use of copyrighted material in U.S. courts—as U.S. law recognized no such objection, such a claim failed as a matter of law. *Id.* at 385, 391.

For the case at hand, this principle means that the district court was required to instruct the jury on the existence of the Xue Xu copyright the same as it would have done had H&M presented a similar registration from the U.S. Copyright Office. *See* 3 David Nimmer and Melville B. Nimmer, Nimmer on Copyright § 17.05 at 17–39 (1994) ("The applicable law is the copyright law of the state in which the infringement occurred, not that of the state of which the author is a national or in which the work was first published."); *see also Auto. Data Sols., Inc. v. Directed Elecs. Can., Inc.*, No. CV 18-1560-GW(Ex), 2018 WL 4742289, at *6 (C.D. Cal. Aug. 15, 2018) (explaining that under the Berne Convention, U.S. law governs whether infringement occurs, while foreign law governs issues of ownership). Namely, the district court was responsible for explaining the Copyright Act's burden shifting approach, which treats a copyright registration certificate as presumptive evidence of a valid copyright and permits the infringing party to rebut the

40

presumption accorded to plaintiff's copyright registration certificate by disputing its validity or challenging the infringement claim itself. *C&J Wear*, 630 F.3d at 1257.

*(ii) H&M's challenges to Jury Instruction No. 27 and Jury Instruction No. 28*

The district court's instructions brought it most of the way there. It instructed the jury that Unicolors retained the burden of proof and was required to prove by a preponderance of the evidence that "Unicolors is the owner of a valid copyright; and H&M LP copied original expression from the copyrighted work." It also explained that H&M could not be charged with infringing Unicolors's copyright if H&M demonstrated it "obtained its design from an entity that independently created the challenged work." And it explained that a jury could conclude that a work was original if it was an author's "independent[]" creation that was made without "copying [] from another work" and involved "at least some minimal creativity."[16] Though the jury was instructed that EH101 was afforded presumptive validity, it was tasked with evaluating whether Unicolors had demonstrated by a preponderance of the evidence that the Xue Xu garments were unoriginal copies of EH101, notwithstanding the evidence of a later-in-time Chinese copyright in the Xue Xu design. Simply, the district court explained that EH101 was granted presumptive

---

[16] The district court included a caveat that evidence tending to prove independent creation could be undercut by evidence of access that "show[ed] a similarity between the plaintiff's work and the defendant's work that is so 'striking' that it is highly likely the works were not created independent of one another." *See infra* Section III.B.3.a.ii.

validity and noted that H&M could rebut the proof of infringement by demonstrating that the source for the Xue Xu pattern had independently created the design.

Given the instructions actually provided, it is clear that the district court did not err in rejecting H&M's first requested instruction regarding the parties' evidentiary burdens, because that requested instruction was duplicative. H&M's proposal simply restated Unicolors's burden in its infringement claim from H&M's point of view. As the district court's Jury Instruction No. 27 explained, Unicolors was responsible for showing that the Xue Xu pattern printed on H&M's garments was more likely than not an unoriginal copy of its pre-existing EH101 design. If Unicolors did not meet this burden, then the jury could come to the conclusion that Unicolors failed to present sufficient evidence to substantiate its claim that Xue Xu was an unoriginal copy of EH101, which is the equivalent of stating that the jury found it more likely than not that Xue Xu was indeed an original design.[17] This conclusion can be reached in one of two ways: (1) Unicolors failed to present

---

[17] Technically, because Unicolors retained the burden of proof, its claim could also have failed if the jury determined that the evidence was in equipoise. But this does not affect our holding for two reasons. First, the disputed instruction regarding the parties' evidentiary burdens framed H&M's required burden as the "preponderance of the evidence" and thus H&M appears to have believed it needed to present evidence that weighed a feather more than Unicolors's did on the issue of originality. Second, as is explained in this section, the district court's other instructions already encompassed the point of law that the excluded language would have communicated. Any error in the district court's reasoning for excluding that instruction was harmless because it was duplicative and would not have affected the jury's verdict.

sufficient evidence, or (2) H&M proved by a preponderance of the evidence that Xue Xu was original. The latter is exactly the instruction H&M requested regarding the parties' evidentiary burdens. Thus, because that instruction simply restated what the district court's other instructions had already explained, we hold that the district court accurately stated the law regarding the parties' evidentiary burdens. *Led Zeppelin*, 952 F.3d at 1065.

The district court's refusal to give the second instruction regarding DOMO's Chinese copyright's presumption of validity is less clear cut. It certainly appears that the district court engaged in the kind of disparate treatment based on foreign status that runs afoul of the Berne Convention when it decided not to grant DOMO's copyright a presumption of originality on account of its Chinese registration. *See Aztech Sys.*, 61 F.3d at 700–01 ("National treatment [] requires this Court to grant [foreign authors] the same copyright protection enjoyed by American authors."). But there is also a colorable argument that the district court's decision did not violate the Berne Convention because it was simply treating the two works the same under U.S. copyright law: given originality is an essential prerequisite for registration with the U.S. Copyright Office and thus a prerequisite for presumptive validity under U.S. copyright law, because the district court did not find that Chinese law had the same originality requirement for registration, applying substantive U.S. copyright law equally to the two works meant that DOMO's copyright in the Xue Xu design would

not have merited registration by the Register of Copyrights and therefore was not eligible for presumptive validity.

Although we are inclined to find that the disparate treatment did not comport with the Berne Convention's dictates, there is no need to delve deeper into this analysis.[18]  As the district court itself recognized, even assuming there is a presumption of originality that should have been accorded to the Chinese copyright, any failure to provide such an instruction would be harmless because H&M, by its own admission, failed to present foundational evidence to the jury that linked H&M's infringing garments to DOMO's Chinese copyright in the Xue Xu design. Although H&M attempts to dispute this contention in one portion of its brief, it ultimately concedes that it did not present to the jury the evidence it prepared connecting the Chinese copyright to its infringing garments and acknowledges that it did not move to introduce into the trial record its only evidence, a declaration from Ms. Wharton, its Chief Financial Officer, in support of its opposition to Unicolors's motion for summary judgment, that purportedly demonstrated this connection. Thus, the jury had no evidentiary basis to determine that H&M was the licensee of

---

[18] The parties also briefly challenge each other's characterization of Chinese caselaw, as well as H&M's compliance with the Federal Rules of Civil Procedure and Federal Rules of Evidence when it provided the district court with English translations of Chinese copyright statutes.  Because we find that any error in the district court's failure to provide the requested instruction was harmless, we do not see a need to wade into the parties' foreign law dispute—especially given its cursory treatment in the briefs.

DOMO's copyright and had no means to determine why DOMO's Chinese copyright was relevant to the trial at hand. This lack of foundational proof means that the jury's determination of Unicolors's infringement claim did not legally turn on the Chinese copyright that H&M tendered and that the district court accepted into evidence. Simply, any presumption of originality that should or should not have been granted to DOMO's copyright was ultimately irrelevant to the outcome of the case. Thus, it is clear that any error that subsisted in the district court's decision to reject H&M's requested instruction on presumptive validity was harmless because it is more likely than not that the verdict would have remained the same had the instruction been given.

Thus, without assessing whether the district court erred in its analysis of Chinese law or its application of U.S. copyright law's presumption of validity to foreign copyright registrations under the Berne Convention, we conclude that the district court's refusal to provide either of H&M's requested instructions does not warrant reversal. The district court properly instructed the jury on U.S. copyright law and the parties' respective burdens. H&M's proposed instruction regarding the parties' evidentiary burdens was simply duplicative of what the jury was already provided. And the district court's exclusion of references to DOMO's copyright in its instruction on the presumptive validity accorded to copyright registration

certificates was harmless because H&M failed to present foundational evidence to the jury connecting H&M's infringing designs to DOMO's copyright.

Thus, taking the instructions "as a whole," we conclude that the addition of H&M's requested instructions would have more likely than not failed to affect the outcome of the trial. *Led Zeppelin*, 952 F.3d at 1065.

(b) H&M's challenge regarding the exclusion of DOMO's U.S. copyright

H&M's second at-trial challenge concerns DOMO's U.S. copyright registration of the Xue Xu design, which registration was procured on the eve of trial by H&M's counsel. The district court excluded the DOMO U.S. registration as "both irrelevant and prejudicial." The court found the registration irrelevant because it "ha[d] nothing to do with whether the design on Defendant's allegedly infringing garments was independently created years ago." The court then found that admission of the registration would "unfairly prejudice Plaintiff to force it to contend with a new copyright registration that was not part of the case throughout fact discovery, summary judgment, and pretrial briefing." Similar to the Chinese copyright-registration issue, H&M argues on appeal that the U.S. copyright registration was relevant to its defense at trial because the registration would have imbued the Xue Xu work with a presumption of independent creation.

H&M is certainly correct that the district court incorrectly discounted this evidence as irrelevant to the jury's determination whether the Xue Xu design is

46

original.  Evidence is relevant if "it has *any* tendency to make a fact more or less probable," Fed. R. Evid. 401 (emphasis added), which is widely recognized as a "liberal" standard, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993). And as H&M points out, this court has long acknowledged that a copyright registration certificate is relevant evidence of the validity of the copyright in question.  *C&J Wear*, 630 F.3d at 1257.  Thus, the U.S. copyright H&M wanted to introduce was certainly relevant evidence of H&M's claim that DOMO's Xue Xu design was independently created and not an unoriginal copy of the EH101 design.

But the district court also excluded the evidence as prejudicial.  We find that this conclusion was not an abuse of discretion, so that any error the district court made in determining the certificate's relevance was harmless.  Even if Rule 401 relevance is satisfied, district courts have the leeway to exclude evidence when it does not satisfy Rule 403: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  The district court concluded that the U.S. copyright H&M wanted introduced had limited probative value, because Xue Xu's U.S. registration was obtained "as part of [H&M's] litigation strategy in defending this case."[19]  And the district court regarded the registration as "a last-minute attempt to manufacture the presumptions

---

[19] H&M acknowledged as much by representing to the court that its counsel sought to have Xue Xu registered "after [H&M] review[ed] . . . Plaintiff's Motion in Limine No 3, which objected to consideration of the Chinese Copyright Registrations."

a United States copyright registration would have conveyed." Both of these conclusions undercut the probative value of the U.S. copyright evidence H&M wanted the jury to review.

The district court's ruling excluding Xue Xu's U.S. registration simultaneously pointed to the prejudice its introduction at trial would cause Unicolors, by highlighting the fact that the registration "was not part of the case throughout fact discovery, summary judgment, and pretrial briefing." Although H&M wishes to pin the prejudice on Unicolors for its "delay in challenging the effect of the Chinese copyright," it does not dispute Unicolors's contention that H&M made "no showing as to why the registration could not have been applied for and secured far earlier in th[e] litigation" nor Unicolors's explanation that the prejudice and surprise created by the late disclosure prevented Unicolors from "obtain[ing] a copy of the deposit material . . . [and] other discovery regarding the registration" as well as limited the time Unicolors had to prepare "to address the material at trial," Even if the proper weight to be accorded this surprise and prejudice is not perfectly clear, the district court was certainly justified in concluding that the unfair prejudice of the DOMO U.S. registration certificate substantially outweighed its probative value—while relevant, the fact that the certificate was obtained on the eve of trial as part of H&M's litigation strategy significantly limited its probative weight.

Moreover, even if the U.S. registration should have been admitted, we do not find that the exclusion of the certificate from evidence "more probably than not . . . tainted the verdict." *Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 688 (9th Cir. 2001). Because the DOMO U.S. registration was obtained on the eve of trial, the inference the registration creates that Xue Xu was original when it was made is quite attenuated: the jury would have had to draw a retrospective inference that the granting of a copyright to DOMO during litigation was indicative of Xue Xu's independent creation several years earlier before the lawsuit was filed. And the jury was already presented with DOMO's Chinese copyright for the same design, which showed that DOMO had sought copyright protection for Xue Xu in the past—albeit four years after EH101 was registered with the U.S. Copyright Office by Unicolors. Moreover, we agree with the district court's ruling that the jury already had sufficient evidence to find that Xue Xu and Unicolors's designs were "strikingly similar," *see infra* Section III.B.3.a.ii, which "allow[s the jury to draw] an inference of copying," *Urban Outfitters, Inc.*, 853 F.3d at 985; *see supra* note 16. These facts substantially weigh in favor of finding that Xue Xu was an unoriginal copy of EH101. Adding the late-blooming DOMO U.S. copyright to the mix would have simply weakly bolstered the existing Chinese copyright the jury was already permitted to review. But it would have failed to undercut the evidence of striking similarity.

Thus, had DOMO's U.S. copyright registration been introduced into evidence, it is more likely than not that the jury would have reached the same verdict. Therefore, we conclude that the district court did not abuse its discretion, even if it erred in its lack of relevance ruling.[20]

(c) Admission of a black-and-white exemplar of EH101

Finally, H&M argues that the district court abused its discretion by admitting into evidence at trial a previously unproduced, physical garment exemplar bearing a *black-and-white* version of EH101. Although the parties before trial stipulated to the admission into evidence of a physical garment exemplar bearing a *colorized* version of EH101, H&M contends that the black-and-white version was "demonstrably, and indisputably, different." However, H&M admitted in its briefing before the district court that it did not object when Unicolors proffered the

---

[20] We also note that there is an additional justification for concluding that the district court did not err in excluding DOMO's U.S. copyright. As explained above, *see supra* Section III.B.2.a.ii, H&M concedes that it ultimately did not present some of the evidence it had prepared that connected the Chinese copyright to the infringing garments at trial. And H&M acknowledges that it did not move to introduce its only evidence purportedly demonstrating this connection into the trial record. Thus, as we explained above, the jury had no evidentiary basis to determine that H&M was the licensee of DOMO's copyright. Therefore, the district court also could have excluded DOMO's U.S. copyright by concluding that H&M failed to present to the jury foundational proof necessary to make the copyright relevant to the jury's determination whether H&M merited its claimed defense by satisfying causation—namely, even if Xue Xu is original, H&M failed to demonstrate that it *was legally permitted to use* DOMO's design, which is a necessary element of that defense.

black-and-white exemplar into evidence at trial. Thus, H&M has forfeited this challenge.

***

Therefore, we conclude that the H&M's at-trial challenges do not require disturbing the judgment below.

### 3. H&M's post-trial challenges

H&M challenges two of the district court's post-trial rulings. It first assails the district court's denial of its renewed motion for judgment as a matter of law ("RJMOL"). Second, H&M argues that the district court abused its discretion in awarding Unicolors attorneys' fees. We begin by reviewing H&M's challenges to the district court's ruling on its RJMOL and then turn to its award of attorneys' fees.

(a) H&M's renewed motion for judgment as a matter of law

*(i) H&M's challenge to Unicolors's '400 copyright registration*

In its RJMOL, H&M first argues that the district court erred in holding that Unicolors possessed a valid copyright in the '400 Registration. As previously discussed, in light of the Supreme Court's decision in this case and a review of the effect of the district court's factual finding regarding Unicolors's lack of an intent to defraud the Copyright Office, *see supra* Section III.A, Unicolors has a valid copyright in the '400 Registration, which covers the EH101 design. Accordingly, H&M's first basis for challenging the district court's denial of its RJMOL fails.

*(ii) H&M's challenge to the jury's "strikingly similar" finding*

H&M next argues that the district court erred in denying its RJMOL by rejecting its contention that no reasonable juror could have found that whoever designed the Xue Xu pattern printed on H&M's merchandise copied in fact Unicolors's EH101 pattern. The district court rejected this basis for judgment as a matter of law because a reasonable jury could have inferred copying in fact for two reasons: (1) the district court concluded that the parties' stipulation to Unicolors's wide dissemination of fabric to H&M's competitors prior to H&M's production of items carrying the Xue Xu design was sufficient evidence that H&M would have had an opportunity to view Unicolors's design; that is, access to Unicolors's design, and (2) that even were the proof of access rejected by the jury, the works' striking similarities created an inference of access that was sufficient to satisfy Unicolors's burden in proving the element of copying. We hold that the district court did not err in its holding regarding copying because its conclusion that the two works are strikingly similar is not clearly erroneous—it properly applied the law and its factual findings were not "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Hinkson*, 585 F.3d at 1263.

Copying requires that the plaintiff prove that the infringing party had "access" to the plaintiff's work and that there is substantial similarity between the two works. *Urban Outfitters*, 853 F.3d at 984–85. But even were evidence of access not

52

presented, a plaintiff would still be capable of satisfying the copying element of its infringement claim by demonstrating "'striking similarity' between the works" to give rise to the inference that the defendant's work was not independently created. *Id.* at 985 (quoting *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987)). Striking similarity, like substantial similarity, is evaluated using the two-prong analysis of the extrinsic test and the intrinsic test. *Id.* Under the extrinsic test, an objective comparison is made between the elements of each work. *Id.* Whereas under the intrinsic test, a subjective comparison is made, which determines whether the two works create a subjective impression that the two works are substantially similar. *Id.* We "will not second-guess the jury's application of the intrinsic test . . . [and] will not reverse factual determinations regarding the extrinsic test absent a clearly erroneous application of the law." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000), *overruled on other grounds by Led Zeppelin*, 952 F.3d at 1066.

The district court, in rejecting H&M's RJMOL, concluded that the jury would have had a substantial basis for concluding that EH101 and Xue Xu were strikingly similar because, in its comparison of the two fabrics, the jury would have been struck by their use of many of the same elements—similarities that the district court had previously highlighted in its own comparison at the summary judgment stage. This holding was not clearly erroneous. That the district court did not conclude as a matter of law that the works were strikingly similar—a disfavored ruling, *see*

53

*Litchfield v. Spielberg*, 736 F.2d 1352, 1355 (9th Cir. 1984)—did not preclude the jury's determination that they were. And the district court reached a plausible conclusion that the jury would have relied on the numerous comparable elements the district court had already explained had the appearance of objective similarity to reach its verdict. Indeed, an independent review of the two fabric designs reveals the striking similarity between the two works. The image transposing the two works, *see infra* Appendix, represents what the jury would have seen by laying the two fabrics admitted into evidence at trial next to each other. Each and every line and design of the Xue Xu jacket sold by H&M is meaningfully similar to the arrangement, combination, and overall design of the fabric bearing the EH101 design. Thus, we are satisfied that a reasonable jury could have found the two designs strikingly similar. *Cf. Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 953 (9th Cir. 2019) (finding striking similarity at the pleading stage by comparing the images of the two lace fabric designs and identifying "near[] identical . . . elements [] arranged in virtually the same way" even when the "color, netting, and shape curvature" were slightly different).

Because there was sufficient evidence to substantiate the jury's finding of striking similarity, we thereby also conclude that Unicolors presented sufficient evidence to prove the copying element of its infringement claim. *Urban Outfitters*, 853 F.3d at 988 (holding that "it is permissible to infer copying" when "the works

are virtually identical" notwithstanding the differing color palettes and slight variances in the shapes and details of the patterns). Thus, the district court did not abuse its discretion in holding as much.[21]

*(iii) H&M's challenge to the jury's finding of willful infringement*

Third, H&M argues that the jury's finding of H&M's willful infringement of Unicolors's EH101 design must be set aside, for two reasons: (1) it was improper to submit the issue of willfulness to the jury; and (2) the evidence at trial does not support a finding of willfulness. Neither argument is persuasive.

H&M contends that the district court abused its discretion in including a question about willfulness in the special verdict because willfulness was irrelevant to the jury's damages award. However, this contention is incorrect, as a jury's finding of willful infringement on the part of H&M is highly relevant to whether Unicolors could receive attorneys' fees under the Copyright Act. *See Historical Res. v. Cabral*, 80 F.3d 377, 379 (9th Cir. 1996). Thus, because there was some evidence to support a finding of willfulness, the district court did not abuse its discretion in submitting a willfulness question to the jury.

---

[21] Because we conclude that the jury had sufficient evidence to conclude that there was striking similarity between Xue Xu and EH101 and because striking similarity "allow[s] a reasonable inference of access" that obviates the need for Unicolors to introduce evidence of access, *Urban Outfitters*, 853 F.3d at 985, 987–88, we decline to reach the merits of the district court's conclusion that Unicolors presented sufficient evidence of H&M's access to the EH101 fabric.

Concerning the evidence supporting the jury's willfulness finding, H&M's sole argument is that it is immunized from willfulness because of the existence of the Chinese copyright in the Xue Xu design, upon which it claims to have relied. However, even assuming H&M's bottom-line immunity conclusion to be correct (which is itself doubtful as H&M fails to cite any authority to support this proposition), H&M acknowledged in its briefing that "evidence connecting the Chinese registration to the accused garments" "was not presented at trial," thus undermining its own position that the jury had the evidence to conclude that H&M so relied. Furthermore, the parties stipulated at trial that H&M held out the infringing garments for sale for over five months following Unicolors's initiation of this lawsuit. H&M's continued sale of the (at the time) allegedly infringing works, despite having notice of this suit, is further evidence the jury could have relied on in determining H&M's infringement was willful. *Cf. Dolman v. Agee*, 157 F.3d 708, 715 (9th Cir. 1998) (relying on defendant's continuing infringement of a copyright after learning of plaintiff's potential claim to uphold a district court's willfulness finding).

Accordingly, we see no reason to disturb the jury's willfulness determination.

*(iv) H&M's challenge to the district court's remittitur calculation*

In its final challenge regarding its RJMOL, H&M argues that the district court erred by impermissibly inflating Unicolors's post-remittitur damages. The district

court's remittitur calculation involved two parts: (1) profit-disgorgement damages of $256,675; and (2) lost-profit damages of $18,534. H&M contends that both values need revision. For the following reasons, we agree with H&M that the district court abused its discretion with respect to the profit-disgorgement damages calculation, although we find no reversible error with respect to the district court's lost-profit damages calculation.

Concerning profit-disgorgement, the jury was tasked with computing the product of (1) the number of infringing garments sold and (2) the correct measure of revenue per garment that merits disgorgement. The jury originally determined that H&M was responsible for 48,000 infringing jackets and 48,000 infringing skirts—totals representing combined domestic and international sales. The jury then relied on H&M's gross profit per piece sold ($4.93 for each jacket and $12.12 for each skirt) to reach a total of $817,920 in profits to be disgorged.

|        | Gross Profit Per Piece | Pieces Sold (Worldwide) | Total Profit |
|--------|------------------------|-------------------------|--------------|
| Jacket | $4.93                  | 48,000                  | $236,640.00  |
| Skirt  | $12.12                 | 48,000                  | $581,760.00  |
| **TOTAL** |                     |                         | **$818,400.00**[22] |

In reviewing H&M's RJMOL, the district court determined that defendant H&M was liable only for United States domestic sales, as this entity was in no way

---

[22] This figure is $480 more than the jury's disgorgement-damages verdict, but there is no other basis in the record for the jury to have reached its disgorgement-damages verdict other than through this calculation—albeit with a minor error.

responsible for international sales, which were entirely controlled by a foreign parent company not a party to this action. Evidence adduced at trial showed that in the United States plaintiff H&M sold 6,535 jackets and 5,464 skirts bearing the Xue Xu pattern. However, instead of reaching a new remittitur value by relying on the aforementioned *gross profit* per piece values as the jury had, the district court interpreted the "maximum recovery rule" of remittitur calculations to require that it should rely on the *average gross sales price* per piece values to arrive at a profit-disgorgement value of $247,675.33.

|  | Average Gross Sale Price Per Piece | Pieces Sold | Total Profit |
|---|---|---|---|
| Jacket | $20.91 | 6,535 | $136,646.85 |
| Skirt | $20.32 | 5,464 | $111,028.48 |
| **TOTAL** |  |  | **$247,675.33** |

The district court grounded its understanding of the "maximum recovery rule" in *Oracle Corp. v. SAP AG*, which stated that "remittitur must reflect the maximum amount sustainable by the proof." 765 F.3d at 1094 (internal quotation marks and citations omitted). But the jury's verdict reflects its determination that Unicolors had proffered evidence that supported a profit-disgorgement award pegged only to H&M's *gross profit* per piece, not to H&M's *average gross sales price* per piece— the jury used the former number to calculate the disgorgement award, not the latter.[23]

---

[23] On appeal, Unicolors appears to have shifted its position on whether the jury's calculation utilized gross profit or average gross sales price per piece. And because Unicolors claims not to have conceded the proper calculation, it instead directs us to

To reflect the maximum amount sustainable by *proof*, the district court should have relied on the jury's calculations as its starting point.

Although we have not stated as such in so many words, this understanding of the maximum recovery rule is well-grounded in the law. As the Supreme Court has explained, the purpose of remittitur is to maintain the jury's verdict while "lopping off an excrescence." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935); *see also Hardenbrook v. United Parcel Serv., Inc.*, 490 F. App'x 45, 47 (9th Cir. 2012) (reversing a remittitur amount that deviated from what "the jury explicitly found"). And this is best achieved by "minimiz[ing] the extent of judicial interference with a matter that is otherwise within the jury's domain." *Earl v. Bouchard Transp. Co., Inc.*, 917 F.2d 1320, 1328 (2d Cir. 1990); *Dimick*, 293 U.S. at 484–86 (defining the scope of a judge's authority to remit damages with reference to the Seventh Amendment's protection of a jury's fact determinations). Thus, a remittitur must reflect the maximum amount sustainable by the proof. But where the method the jury used to calculate its award can be ascertained by a review of the verdict, the

_____

a prior opinion of this court, which held that "[a]ny doubt as to the computation of costs or profits is to be resolved in favor of the [prevailing] plaintiff." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514 (9th Cir. 1985). But this is of no help to Unicolors. As explained above, *see supra* note 22, there is no other basis for the jury to have calculated the award that it did—even with the arithmetical error of being $480 short, there is no doubt that the jury based its verdict on the gross profit per piece value.

judge is responsible for preserving the jury's findings to the greatest extent possible by using that method of calculation in determining the remittitur amount.

Therefore, the district court's profit-disgorgement remittitur calculation was an abuse of discretion, as that amount cannot be sustained using the jury's findings of what Unicolors actually proved at trial. The correct profit-disgorgement award calculation using the values the jury had is as follows:

|  | Gross Profit Per Piece | Pieces Sold | Total Profit |
|---|---|---|---|
| Jacket | $4.93 | 6,535 | $32,217.55 |
| Skirt | $12.12 | 5,464 | $66,223.68 |
| **TOTAL** | | | **$98,441.23** |

Accordingly, a profit-disgorgement figure of $98,441.23 removes the excrescence of profits from extraterritorial sales and the use of the average gross sales price rather than gross profit multiplier, while sustaining the remainder of the jury's verdict.

Concerning lost profits, the jury awarded Unicolors lost profits of $28,800, which included both domestic and international sales of the infringing garments. Because the district court found that H&M could not be held liable for non-U.S. sales, the court concluded that an adjustment to Unicolors's lost profits award was required. The sole evidence adduced at trial about lost profits came from Mr. Pazirandeh, who testified that Unicolors would have made up to $2 per jacket and up to $1 per skirt had H&M purchased fabric from Unicolors to make the infringing garments. The district court then calculated the maximum amount of lost profits that Unicolors could have incurred as a result of H&M's infringement to be $18,534.

|        | Lost Profit/Piece | Pieces Sold | Lost Profit |
|--------|-------------------|-------------|-------------|
| Jacket | $2.00             | 6,535       | $13,070.00  |
| Skirt  | $1.00             | 5,464       | $5,464.00   |
| **TOTAL** |                |             | **$18,534.00** |

On appeal, H&M argues that the entirety of the jury's lost-profits award "was improper and should be set aside," but does not clearly articulate the basis for that assertion. H&M claims that "Unicolors did not produce any evidence of lost profits in its initial disclosures or otherwise," and that H&M "accordingly made a [motion in limine] to exclude" evidence of lost profits, which presumably means that H&M is challenging the district court's denial of that motion in limine. But the district court's denial of the motion in question was at *H&M's request* so that the evidence could be evaluated "on a piece-by-piece basis" at trial. And the district court expressly noted that it would bar the "introduc[tion of] evidence that [Unicolors] was required to produce during discovery but did not," if H&M timely objected. At trial, however, H&M failed to object to Mr. Pazirandeh's testimony about lost profits. Accordingly, H&M has forfeited any challenge related to the admissibility of lost-profits evidence.

Therefore, we conclude that the proper remittitur amount to take the place of the jury verdict's damages amount should have been $116,975.23, which is the sum of the proper profit-disgorgement award of $98,441.23 and a lost-profits award of $18,534.00. In addition, the rule that a court's use of the remittitur should minimally interfere with a jury's verdict militates in favor of restricting a new trial—should

Unicolors reject this new remittitur amount—only to the issue of damages, given that we do not find a reason to upset the district court's evidentiary decisions or otherwise conclude that the jury's liability verdict should be displaced. *Watec Co. v. Liu*, 403 F.3d 645, 655 (9th Cir. 2005); *Cosby v. AutoZone, Inc.*, 445 F. App'x 914, 917 (9th Cir. 2011). Thus, on remand, the district court is instructed to grant H&M's request for a new trial if Unicolors rejects this new remittitur amount of $116,975.23. But the new trial must be limited only to the issue of damages.

(b) Unicolors's motion for attorneys' fees

Finally, H&M argues that the district court abused its discretion in awarding Unicolors's attorneys' fees. Specifically, H&M argues that it was clearly erroneous for the district court to find that (1) H&M asserted "unreasonable arguments" in relying on the Xue Xu Chinese copyright during litigation, and (2) secondary factors militate in favor of an attorneys' fees award.

The Copyright Act provides that in a copyright-infringement action, "the court . . . may allow the recovery of full costs by or against any party other than the United States," including "a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. Whether to award attorneys' fees under the Copyright Act is a matter of the trial court's discretion, not of a party's right. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994).

A court is granted "'wide latitude to award attorney's fees based on the totality of circumstances in a case,' [so long as] its discretion . . . [is] tethered to judicial guideposts." *Glacier Films (USA), Inc. v. Turchin*, 896 F.3d 1033, 1037 (9th Cir. 2018) (quoting *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 203 (2016)). The Supreme Court has articulated a list of factors for courts to consider in determining whether to award fees: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty*, 510 U.S. at 534 n.19 (internal quotation marks omitted); *see also Kirtsaeng*, 579 U.S. at 202. This court recognizes additional factors that may be considered, including "the degree of success obtained in the litigation," but the unreasonableness factor is given substantial weight in the district court's analysis. *Glacier Films*, 896 F.3d at 1037.

In awarding Unicolors attorneys' fees, the district court found that H&M asserted at least one unreasonable argument. Specifically, the court found:

> [H&M] filed multiple motions arguing that the design on its garments was presumptively original because of a Chinese copyright registration obtained by a third party. While [H&M]'s legal argument that a foreign registration could convey a presumption of originality was not objectively unreasonable, [H&M] failed to provide any evidence connecting the Chinese registration to its own garments. [H&M] therefore acted unreasonably in repeatedly litigating an issue that was irrelevant to the resolution of Unicolors'[s] claims[, which occurred at trial].

63

H&M does not dispute that it did not introduce any evidence at trial connecting the Chinese registration for Xue Xu to H&M's infringing garments bearing the Xue Xu design.[24] While conceding this evidentiary gap in its case, H&M contends that it failed to introduce the necessary evidence because "the [district] court sustained objections to Wharton's deposition testimony . . . [that] demonstrat[ed] the accused garments came from DOMO and were protected by a copyright registration."[25] But H&M makes no argument on appeal specifically detailing why the district court's ruling to exclude some unspecified deposition testimony of Ms. Wharton was erroneous.[26] H&M has therefore forfeited this challenge.

Because H&M presents no developed argument for why the district court erred in excluding unspecified portions of Ms. Wharton's deposition testimony from being read into evidence at trial, there is nothing clearly erroneous about the district

---

[24] H&M makes much of its submission of declarations from Ms. Wharton, its Chief Financial Officer, and Ms. Qian, the purported Xue Xu creator at DOMO, in support of its opposition to Unicolors's motion for summary judgment. But this is of no help to H&M, because it concedes that "[t]his evidence ultimately was not presented as testimony at trial." Given this concession, it follows as a matter of course that the jury's resolution of Unicolors's claim was made without regard to the evidence "connecting the Chinese registration to its own garments." And this means that the "issue [] was irrelevant to the [ultimate] resolution of Unicolors'[s] claims."

[25] H&M intended to have Ms. Wharton testify as a witness, but she was ultimately unable to attend because the district court had to continue the trial due to other previously scheduled matters. As a result, the district court permitted portions of Ms. Wharton's deposition testimony to be read into evidence in place of her live testimony.

[26] H&M fails even to identify what portions of Ms. Wharton's deposition transcript should have been admitted at trial.

64

court's finding that H&M failed to proffer evidence at trial connecting the Chinese registration for Xue Xu to H&M's infringing garments bearing the Xue Xu design. And by repeatedly litigating an issue on which it ultimately proffered no evidence at trial, H&M adopted an unreasonable approach to prosecuting its defense. As a result, the district court did not abuse its discretion in its evaluation of the unreasonableness factor.

Concerning the balance of secondary factors, H&M contends on appeal that, if anything, most of the secondary factors "mitigate [sic] against a fee award." But H&M's dispute with the district court's findings in this regard focuses exclusively on Unicolors's purportedly low degree of success following its acceptance of the district court's remittitur.[27] Yet even as measured against this panel's further reduction of the district court's remittitur amount, there can be no doubt that Unicolors won a substantial success in the district court by establishing H&M's liability as a willful infringer. *Glacier Films*, 896 F.3d at 1038 ("Actual success in an infringement action involves establishing the defendant's liability."); *cf. Cabral*,

---

[27] Of course, Unicolors initially accepted a remittitur amount substantially higher than that which we have calculated was consistent with the jury's reasoning and findings. But that does not alter our conclusion that Unicolors was successful in obtaining a verdict that held H&M liable as a willful infringer. And Unicolors will have the opportunity on remand to accept or reject the remittitur amount assessed here.

80 F.3d at 379 (acknowledging that "willful infringement is an important factor favoring an award of fees").

Accordingly, the district court did not abuse its discretion in awarding attorneys' fees to Unicolors.

## IV. CONCLUSION

For all the foregoing reasons, we do not find any of H&M's arguments concerning claimed errors by the district court persuasive, except those pertaining to remittitur as described above.[28]  Accordingly, we vacate the judgment and remand the case back to the district court with instructions to grant a new trial on the issue of damages only if Unicolors rejects the lower remittitur amount of $116,975.23. Each side shall bear its own costs on appeal.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.**

---

[28] To the extent H&M raised other arguments throughout its briefing, we summarily reject those arguments as being underdeveloped, and therefore forfeited.  *See* Fed. R. App. P. 28(a)(8)(A) (stating that argument on appeal must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *see also Cal. Pac. Bank v. FDIC*, 885 F.3d 560, 570 (9th Cir. 2018).

